UNITED STATES DEPARTMENT OF TRANSPORTATION
FEDERAL RAILROAD ADMINISTRATION
WASHINGTON, D.C.

```
FRA - LOCOMOTIVE ENGINEER    )
CERTIFICATION CASE           )
                             )
C.L. DANIELS,                )
HEARING PETITIONER           )
                             )
DOT DOCKET NO.               )
FRA-2001-9837                )
                             )  D E P O S I T I O N
FRA DOCKET NO. EQAL 0051     )
```

DEPOSITION OF CHARLES L. DANIELS

        Deposition of CHARLES L. DANIELS, taken
at Union Pacific Headquarters, 1416 Dodge Street,
Omaha, Nebraska, beginning at 9:30 a.m., Tuesday,
October 8, 2002, before Bobbi M. Randall, RPR, a
General Notary Public within and for the State of
Nebraska, pursuant to Notice.

BOBBI M. RANDALL, RPR
MATHESON-TAULBORG-DENNEY-SCHLEIFE
7602 Pacific Street, LL101
Omaha, NE 68114
(402) 397-9669

---

APPEARANCES

For the FRA:

DANIEL ALPERT
Suite 1120 Vermont Avenue, NW
Washington, DC 20590

For Union Pacific:

SCOTT HINCKLEY
1416 Dodge Street
Omaha, NE 68179

For Brotherhood of Locomotive Engineers:

RICHARD K. RADEK
GREGORY E. ROSS
1370 Ontario Street
Cleveland, OH 44113-1702

INDEX

| CHARLES L. DANIELS | Page |
|---|---|
| Direct Examination by Mr. Radek | 2 |
| Cross-Examination by Mr. Hinckley | 15 |
| Further Cross-Examination by Mr. Alpert | 28 |
| Redirect Examination by Mr. Radek | 31 |
| Certificate | 34 |

EXHIBITS:

| 1 - Statement of Issues | 22 |
|---|---|
| 2 - 49 CFR Part 240 | 27 |

---

CHARLES L. DANIELS,
    called as a witness, having been
    first duly sworn, was examined
    and testified as follows:

            DIRECT EXAMINATION

BY MR. RADEK:

Q   Good morning, again, Charles.

A   Good morning.

Q   Yesterday there was a deposition taken of
Mr. Larry Breeden, and you know the capacity that he
works for the carrier, and he was the one who rode with
you and eventually, I guess, disqualified you as a
locomotive engineer?

A   Right.

Q   Okay.  There were a couple things that he
said yesterday that I'd like to ask follow-up questions
to you about, just to make sure that you know we've got
the accurate facts.  The first thing has to do with
your promotion to class one locomotive engineer, and in
connection with that, there were train ride detail
reports.  This was submitted yesterday as exhibits.  It
was Exhibits 8 and 9, and the one that I'm going to
work from is yesterday's Exhibit No. 9.

        In this Exhibit No. 9, there is a train ride
detail report, Charles, for a trip that you made on

---

June 10th, 1999.

A   Okay.

Q   This is the trip, I believe, when the
supervisor who rode with you certified you as a class
one locomotive engineer; is that right?

A   That's correct.

Q   Okay.  Do you remember this particular trip?

A   I can remember vaguely some of it, yes.

Q   Okay.  So I see the trip was from North
Little Rock to what is this, Wynne Avenue?

A   Wynne, Arkansas.

Q   Arkansas.  Wynne, Arkansas.  The report shows
you scored 94 on that trip, and there's a notation that
you were promoted to class one engineer on that trip.

A   That's correct.

Q   Okay.  After you were promoted on that trip,
then did you start working as a locomotive engineer on
your own?

A   Yes, I did.  I am trying to visualize.  I
believe -- I don't know if -- I can't say that I took a
week's vacation or not.  I can't remember, but
immediately after I got qualified, I can remember
calling up and being class one engineer and available
for rides.

Q   Okay.  I have another exhibit that was

**Page 5**

```
 1   entered yesterday, Exhibit No. 1, and this is kind of a
 2   day-by-day list of all of the trains that you had been
 3   assigned to run when you were a student engineer and the
 4   trains that you worked when you were promoted and were
 5   a class one engineer.  So I'm looking at the last three
 6   pages now of Exhibit No. 1, Charles.  I want you to
 7   look at these entries, and first, I want you to tell me
 8   that between -- or I want to ask you, between
 9   July 17th, which is the first trip listed, and then we
10   go down through the list, and it has 30 more -- 30
11   entries that end on September 7th.  Would you look at
12   that list, and would you tell me, were you, in fact, a
13   class one promoted engineer and working as an engineer
14   on all of those trips?
15       A    Okay.  By looking at this page starting from
16   July 17th, I can see that a couple of these were yard
17   jobs, and on the -- specifically I remember the 22nd,
18   July 22nd, that was a Pine Bluff yard job.  The other
19   trips I could see are going from Little Rock up to the
20   west end of Arkansas, which is up to Fort Smith.  A
21   couple of these rides -- the first three rides, I know
22   the first three rides I had a pilot familiarization of
23   the territory, since I hadn't been up that area.
24       Q    Now, when you say the first three, do you
25   mean July 17th, July 19th --
```

**Page 6**

```
 1       A    I'm thinking of the 22nd and the 26th and
 2   the -- the 26th, 27th, 28th is what I'm thinking.
 3       Q    26th, okay, so that is line four, line five,
 4   and line six?
 5       A    And line six, right.
 6       Q    Okay.  Did you have a pilot on line 7,
 7   July 25th, when you had the CNRAW train?
 8       A    Um-hum.  I can't recall.  Now, I know if it
 9   was a coal train, I wasn't really qualified to run
10   dynamic coal train, and if it was a coal train -- I
11   don't know the identifiers, it's been so long.  I asked
12   CMS for a pilot.  And I can't recall -- like I say, I
13   don't know the identifiers of the trains now.  I have
14   forgotten about them, so that's about it.
15       Q    Well, did you have a pilot on every trip that
16   you made here between July 17th and September 1st?
17       A    No, I didn't.  Some of these I ran as a fully
18   qualified engineer, just myself and the conductor.
19       Q    Now, when you had a pilot, is it because of
20   unfamiliarity with the territory, generally, that you
21   would ask for a pilot?
22       A    Normally that's what I would ask for, a pilot
23   because of the unfamiliar territory.
24       Q    Okay.  Now, you said about -- something about
25   the coal train --
```

**Page 7**

```
 1       A    Coal train.
 2       Q    Yeah.  Is that distributive power or -- that
 3   you were unfamiliar with -- or just, you know, you said
 4   dynamic?
 5       A    Right, dynamic brakes, but it was distributed
 6   power, so correction on that.
 7       Q    Yeah, just to clarify, so it wasn't dynamic
 8   brakes that you were talking about?
 9       A    No.
10       Q    It was --
11       A    Distributed power.
12       Q    What is distributive power?
13       A    Distributed power is one engine in the rear
14   of the train, two engines in the front, whereas you get
15   controlling the train from the -- sending signals back
16   to the rear engine to help you, say, push the train up
17   a hill or slow you down by sending signals to the rear
18   cab.
19       Q    Okay.  So you're actually operating a second
20   locomotive from the lead locomotive?
21       A    True.
22       Q    Okay.  And that's what distributive power is?
23       A    Right.
24       Q    Yesterday Mr. Breeden, when he was deposed,
25   said that it took you more student trips than the
```

**Page 8**

```
 1   average, let's say, for other student engineers because
 2   it took you, like, 145 trips before you were promoted
 3   to class one engineer.  And he said, I believe, that it
 4   was normally 80 to 100 trips before an engineer would
 5   be qualified.  How do you explain, Charles, that it
 6   took you an additional 40 or 45 trips before you
 7   qualified as a class one engineer?
 8       A    The reason -- since my only job prior to
 9   going into the engineer service was a
10   switchman/brakeman working only in the yard, and by
11   being an engineer, I had -- being a brakeman/switchman,
12   I had never worked outside of the yard or any of these
13   territories that the train ran on.
14       Q    How long were you a switchman before you went
15   to engineer's training?
16       A    I would say about two, two-and-a-half years
17   maybe.
18       Q    Okay.  So what you're saying is for two or
19   two-and-a-half years, you worked entirely in the yard
20   and you were never out on the road?
21       A    That's correct.
22       Q    Okay.  All right.  Didn't mean to interrupt
23   you, but I thought we should clarify that point.  Okay,
24   so you were explaining why it took you 145 trips to
25   qualify as a locomotive engineer.
```

1    A    Right.

2    Q    Do you want to go ahead and answer the

3 question now?

4    A    By being a brakeman in the yard, let's say I

5 was not familiar with the territory.  It was certain

6 things that a regular engineer or regular conductor

7 does on the job that helps him, easier for him to be an

8 engineer.  Whereas myself as a switchman, I had to

9 learn all of the responsibilities or the job knowledge

10 that a conductor has in addition to learning the

11 engineer portion.  Whereas a conductor, he's out on the

12 road already, he's out there a couple of years learning

13 the territory already, out there to learn was the

14 engineer aspects of the train.  Whereas, myself, by

15 being in the yard, all this was new to me.  I had never

16 been exposed to a territory.  Ups and downs on hills, stuff like

17 being territory?  Ups and downs on hills, stuff like

18 this, track warrants.  I never knew nothing about track

19 warrants.

20    Q    Okay.  So you actually didn't have road

21 experience before you started engineer training, but

22 your engineer training dealt with the road territory?

23    A    That's correct.

24    Q    So you're saying, then, that people that had

25 been on the road, you know, had a leg up on you, so to

9

1 speak, because they were familiar with the territory

2 and didn't have as much to learn?

3    A    I would say yes.

4    Q    Okay.  All right.  These particular

5 assignments now that you started to work on

6 July 17th -- you know, looking again at Exhibit

7 No. 1 -- all of these assignments you worked as a

8 promoted class one engineer you told us, right?

9    A    That's correct.

10    Q    Okay.  And was there a point that you reached

11 where a carrier officer, I think it was Mr. Kifer, told

12 you or explained that you needed more or additional

13 training?

14    A    Yes.  Steve Kifer did call me in the office,

15 said he was concerned and wanted me to take a couple of

16 more pilot trips or have a pilot help me out on the

17 territory.

18    Q    Okay.  So does that explain, then, why on

19 page 3 of Exhibit 1, at line 146, that there were --

20 that all of these trips are listed with your student

21 engineer trips again?

22    A    I believe so.

23    Q    So you --

24    A    I can't -- I believe those were -- the rest

25 of them, which you have, are my student trips.

10

1    Q    Okay.  So you were working --

2    A    As a promotable engineer, but they had put me

3 in the position or -- as a fireman.  I went back and

4 talked to my union officials, and they got me back --

5 since I was a promotable engineer, qualified engineer,

6 I got my back pay back as not being a fireman but being

7 as a fully qualified engineer.

8    Q    Okay.  Let me try to understand what you've

9 told us.  At line 146 of the -- of this printout, you

10 were not working as an independent class one engineer

11 any longer, but you were making more training trips?

12 Is that what was happening?

13    A    To my understanding, that's what I believe

14 what happened, yes.

15    Q    Okay.  Did Mr. Kifer ask you if you wanted to

16 become a student engineer?

17    A    No, he did not.

18    Q    Well, how did this -- what exactly took

19 place, then?

20    A    Oh, all I can remember vaguely is that

21 Mr. Kifer wanted me to take additional trips, and he

22 felt that I -- I don't know if he felt that I wasn't

23 qualified or what, but he mentioned that he wanted me

24 to have training.  That's all I can vaguely remember

25 right now.

1    Q    Okay.  And so when you began the training,

2 you were getting paid the pay rate that would apply to,

3 what, a fireman or a student engineer?  Do you remember

4 what pay rate you were getting?

5    A    I was -- I believe I was getting pay rate as

6 a fireman.

7    Q    Okay.  And so then, because they were paying

8 you the fireman's rate, which is less than the

9 engineer's rate, you went to the union, and you asked

10 them to take steps to get you paid as a locomotive

11 engineer?

12    A    That is correct.

13    Q    And the company did eventually, then, pay you

14 as a locomotive engineer?  They made up the difference

15 to you?

16    A    That is correct.

17        MR. RADEK:  Okay.  We could maybe take a

18    recess for about five minutes, please.

19        (Recess)

20    Q    (By Mr. Radek)  We're back on the record.

21 Charles, how did you find out, after you had been

22 working as a promoted engineer, that you were no

23 longer, evidently, a promoted engineer, that they were

24 wanting you to work as a fireman?

25    A    I had just returned off a trip.  CMS called

17

1  me, notified me that Steve Kifer revolted (sic) my
2  engineer's license, and that he was putting me back as
3  a student.
4      Q    Do you remember about when that happened?
5      A    I want to say the first part -- let me see.
6      Q    Would it help your memory if you looked at
7  the printout of these trips here?
8      A    Yeah. I want to say the September 7th or
9  8th, something like that.
10     Q    Okay. So you had been working as a
11  locomotive engineer, and then on September -- about
12  September 8th?
13     A    Right.
14     Q    -- you were notified by crew management that
15  you were no longer a class one engineer?
16     A    That's correct.
17     Q    Okay. And did Mr. -- did Mr. Kifer at that
18  point, you know, say anything to you, or did he -- did
19  you receive a letter or any kind of other information
20  that you were not evidently a class one engineer any
21  longer?
22     A    I received a letter from Steve Kifer saying
23  that he had ridden with me on a trip that he found
24  that -- he felt that some of my train handling
25  abilities were unacceptable to him, and that's when

13

1  he --
2      Q    Okay. Could you look at this exhibit? This
3  is Exhibit 5, which was entered yesterday, and there
4  is -- it's a letter dated September 8th, 1999,
5  addressed to you.
6      A    Okay.
7      Q    Okay. And it says that -- in its last
8  sentence, that you will be receiving a student engineer
9  license, will be placed with an engineer for
10  approximately 30 days, and then be reevaluated, okay.
11  Is this the first letter that -- or the first knowledge
12  that you received from Mr. Kifer that you were not a
13  class one engineer any longer?
14     A    Yes, it is.
15     Q    Okay. Yesterday we also entered into
16  exhibit -- as an exhibit this February 7th, 2003,
17  letter addressed to you, and this came from Mr. Larry
18  Breeden.
19     A    Okay.
20     Q    Okay. This particular letter refers to you
21  not passing a skills performance, and Mr. Breeden
22  explains that he's removed you from service because you
23  failed the certification evaluation.
24     A    That's correct.
25     Q    You remember receiving that letter?

14

1      A    Yes, I do.
2      Q    Okay. And is this the first time that you
3  had received a letter saying that you had failed
4  certification?
5      A    Yes, it is. I believe it is.
6          MR. RADEK:  Okay. Charles, I don't have any
7  further questions for you right now, but the
8  attorneys for the other parties will probably have
9  questions for you.  Do you want to recess before
10  we continue, or would you just like to go right
11  on?
12         THE WITNESS:  Let me take a recess right
13  quick here.
14         MR. RADEK:  Okay. Can we have about five
15  minutes?
16         MR. HINCKLEY:  Okay. Dan, do you have a
17  preference when we start up as to how we proceed?
18  In other words, do you want to go first or do you
19  want me to?
20         MR. ALPERT:  You can go first. I mean, you
21  have some of the letters and exhibits in front of
22  you.
23              (Recess)
24              CROSS-EXAMINATION
25  BY MR. HINCKLEY:

15

1      Q    Mr. Daniels, I'm just going to start to
2  follow up on some questions before I get into some
3  others here.  You had said earlier that as a -- before
4  you were promoted or before you entered engineer
5  training, you had never been on the road?
6      A    True.
7      Q    Okay. New hire training for the past several
8  years has consisted of classroom training and road
9  trips for new hire switchman/brakeman conductors, and
10  during that training, you never went on the road?
11     A    Never went on the road.
12     Q    You never took conductor training classes?
13     A    Never had conductor training classes.
14     Q    Are you aware that there are many engineers
15  out there who did not come from the ranks of
16  conductors?
17     A    Every engineer that I know was conductor
18  qualified. I cannot think of anyone that had not
19  been -- went all the way from switchman up to an
20  engineer.
21     Q    Are you aware that there are many engineers
22  who were never conductors or switchmen that came from
23  the ranks of other crafts?
24     A    No.
25     Q    Okay. When you were in engineer training.

16

1 were you also in conductor training at the same time?
2   A   No.
3   Q   Okay. So when you were out on the road for
4 those 145 trips, that was just engineer training?
5   A   On them -- well, I would say that I had to
6 learn some of the job responsibilities that the
7 conductor knew. I had to learn, like I say, track
8 warrants and stuff like this.
9   Q   Aren't those engineer jobs, responsibilities?
10   A   Mostly -- to my understanding, conductors had
11 to know it also, and they knew it, you know. And so I
12 would say they would have to know it also, true, but
13 conductors knew it first. They were exposed to it a
14 lot sooner. They had more knowledgeable -- they had a
15 lot more training in it than I did.
16   Q   Okay. Earlier you had said that when you
17 had -- on the engineer sheet, the one that shows you
18 the 30 trips as an engineer, that you had requested a
19 pilot for the first few road trips because you had not
20 been on that territory before.
21   A   That is true, yeah.
22   Q   If we could look at --
23   A   Let me back up here for a second.
24   Q   Oh, okay.
25   A   During 30 days, when I went out on the road

15

---

1   Q   So your earlier statement that you had asked
2 for a pilot because you had not been over that
3 territory before was --
4   A   Prior -- the reason why I went on that
5 territory was to learn track warrants. Now, if you
6 could see, that was back in '98.
7   Q   All right.
8   A   And then when I started going on it --
9 initially as an engineer in August and July, I was -- I
10 would say, what, a year and a half almost?
11   Q   Well, about eight months later?
12   A   Okay.
13   Q   If we look at October, November, December
14 of '98 and then your engineer trips are in July of '99,
15 that's about eight or nine months, not a year and a
16 half. Okay. Is it your testimony, then, that in all
17 of these trips on Exhibit 1 showing you as a fireman,
18 that you were out there learning track warrants?
19   A   Yes, I was learning the track warrants and
20 learning the territory. Some of the time the engineer
21 that I had as a trainer instructor, I wasn't getting
22 seat time. I was -- some of them would say, well, just
23 go sit on the side there, and I will run the train, I
24 do not like -- I do not want students, I did not ask
25 for students.

17

---

1 as a student engineer, in that territory, I was
2 learning the aspects of the track warrants before I
3 went to school again.
4   Q   Well, I'm confused.
5   A   You're confused.
6   Q   Earlier you had said you had not been on that
7 territory.
8   A   Not been on that territory, right.
9   Q   Are you now saying on your student
10 engineering trips, you had been on that territory? Let
11 me help refresh your memory.
12   A   Thank you.
13   Q   On Exhibit 1, if you turn to the first
14 page --
15   A   Yes.
16   Q   -- and you look, beginning at line 15, you
17 will see a series of board IDs that refer to RED?
18   A   Right.
19   Q   And also refer to X344 to L158, are those
20 trips not the same as on your engineer trips, the 5E9C
21 X344 to L158? Aren't those over the same territory?
22   A   Yes, they are.
23   Q   Okay. So you had been over that territory
24 before as a student engineer?
25   A   Yes. I had.

18

---

1   Q   Did you tell your manager of those trips?
2   A   No. I didn't.
3   Q   Did you get paid for those trips?
4   A   As a fireman, I did.
5   Q   Yes. So you got paid, and you say that they
6 didn't let you operate, but you didn't tell anybody?
7   A   Yes, that's correct. This was a -- a
8 standard procedure.
9   Q   Did you ride with other firemen?
10   A   Other firemen?
11   Q   Yeah.
12   A   No.
13   Q   So you don't have any firsthand knowledge of
14 what other firemen did?
15   A   This was, let's say, by crossing paths in the
16 section and we would talk, and this came up.
17   Q   Okay. So it was standard procedure to ride
18 and not get seat time and collect pay for that but not
19 tell management?
20   A   That is correct. We knew no other way of
21 corresponding this. I didn't know how to correspond.
22 All I know --
23   Q   You didn't have a manager?
24   A   True.
25   Q   You had a manager?

20

```
1    A    I had a manager.
2    Q    You had a manager, okay.  Let me move on to
3  some other questions.  The territory that you rode with
4  Mr. Breeden was in the territory north of Little Rock
5  towards Dexter?
6    A    Correct.
7    Q    All right.  Had you been over that territory
8  before?
9    A    Correct.
10   Q    If you look on Exhibit 1 again, this
11 document, very first page, it looks like your first
12 trips were on that territory, the first eight or nine,
13 ten trips; is that correct?
14   A    That's correct.
15   Q    Okay.  Then going to the bottom of that page,
16 there's another series of trips over that territory?
17   A    That's correct.
18   Q    Okay.  And then turning over to the third
19 page, the trips in the first half of July were over
20 that territory, beginning with trip 138?
21   A    That's correct.
22   Q    Okay.  And then turning again to item -- to
23 trip number 238, there are another series of trips over
24 that territory?
25   A    That's correct.
                                          21
```

```
1    Q    (By Mr. Hinckley)  Okay.  Qualify him on new
2  territory.  Then down on Roman Numeral 2, it refers to
3  item one, a new territory, and in item two it refers to
4  a new territory.  You've just testified that you've had
5  trips throughout several months over that territory, so
6  was this a new territory?
7    A    Well, what I'm -- the reason why I did that
8  is because we had five different territories, all
9  completely different, and I just had -- once you go
10 into one territory, you kind of lose sight of how that
11 territory is ran, and I was just getting more familiar
12 with it.  I'm pretty sure that when you first take a
13 trip or several trips, you don't know where every
14 signal is, every road crossing is at, where a hill is
15 at, where it descends, curves, and this is a lot of
16 information that we as students had to absorb, and they
17 said we had to know all of the territories.
18   Q    But this territory that you took the test
19 over with Mr. Breeden was not a new territory?
20   A    No.  I had been on it before.
21   Q    Yesterday we had an Exhibit 3, and that
22 listed all of your trips.  And the top one is that
23 particular territory, and how many trips does that
24 recap show?
25   A    It shows 46.
                                          23
```

```
1    Q    So at least four different times you were put
2  on that territory for trips?
3    A    That's correct.
4    Q    I'd like to hand you and mark this as an
5  exhibit, which is the -- I don't know what number that
6  is.
7         (Exhibit No. 1 was marked for
8  identification.)
9         MR. HINCKLEY:  Dan, this is the Stipulations
10 of the Brotherhood of Locomotive Engineers.
11        MR. RADEK:  This is our Hearing Petitioner
12 Daniels' Statement of Issues.
13        MR. HINCKLEY:  Right, Statement of Issues.
14        MR. ALPERT:  Statement of Issues.
15        MR. HINCKLEY:  Statement of Issues, Hearing
16 Petitioner Daniels' Statement of Issues, and it is
17 dated September 7 of 2001.
18        MR. ALPERT:  Okay.  I got it.
19        MR. HINCKLEY:  Okay.
20        Q    (By Mr. Hinckley)  Mr. Daniels, in here, in
21 the first Roman numeral 12, it refers to and it uses
22 the word quality, but I think it's qualify.
23        MR. HINCKLEY:  Rick, would that, item two,
24 "and only to quality," should that be qualify?
25        MR. RADEK:  "Qualify him" it should read.
                                          22
```

```
1    Q    Okay.  Yesterday we had this letter that
2  we -- you looked at earlier, which is Exhibit 5, and
3  Mr. Breeden is very specific in some of the things that
4  he talks about in that letter, okay.  And going down
5  there, he testified yesterday that at a 10 miles an
6  hour speed restriction, that you were traveling at 19
7  miles an hour.  Do you recall him talking to you during
8  the trip about going too fast?
9    A    I believe -- say that one more time.
10   Q    Yesterday he testified that with a
11 10-mile-an-hour speed restriction in the siding at Bald
12 Knob, that you had operated at 19 miles an hour.  Do
13 you remember him talking to you about that?
14   A    I remember him saying something about that.
15   Q    Was he incorrect in his statement?
16   A    I believe he was incorrect.
17   Q    Okay.  He says that you were moving from
18 power to dynamic braking, that the time required and
19 the rule requires 20 seconds, and you waited only 6
20 seconds at several locations.  Was he incorrect in
21 that?
22   A    I believe so, because I was going on the
23 assumption I always waited an average of 10 seconds.  I
24 learned this part through my train handling book, which
25 was through the school.
                                          24
```

1    Q  Okay. He says the engineer who you were with
2 and he had to remind you three times of the rule
3 requirement while moving at restricted speed. Is he
4 incorrect there?
5    A  He did remind me. But I don't know how many
6 times, but he did.
7    Q  Did you in writing take exception to anything
8 that he wrote you?
9    A  Did I write anything out?
10    Q  Yeah, did you respond back to his letter?
11    A  No, I didn't.
12    Q  Did you call him up and take exception to any
13 of this?
14    A  No, I didn't. The reason why probably is
15 after this trip, which I had been on duty for
16 approximately about 16 hours, approximately 15 or 17
17 hours, I was on duty on this trip here. I was tired,
18 and after he asked me a question, he said there was
19 other things that he had noticed that he didn't want to
20 say, and that was it, you know. So after that, we went
21 downstairs, and he asked for my license.
22    Q  You're not saying you ran the train for 16
23 hours?
24    A  No, I didn't run the train for 16 hours, no,
25 but I was on duty for approximately 16 hours.

25

1        MR. HINCKLEY: This is part of a copy of 49
2 CFR part 240, Dan.
3        (Exhibit No. 2 was marked for
4 identification.)
5    Q  (By Mr. Hinckley) In A, Mr. Daniels, did
6 you -- and I'm reading from the language towards the
7 end, did you explain or rebut the adverse information
8 in writing at any time to the carrier?
9    A  No, I didn't. I did not know procedures for
10 this.
11    Q  Did you talk to the union?
12    A  No, I don't recall. I can't recall about
13 this, talking about this.
14    Q  When you received the letter from
15 Mr. Breeden, did you talk to the union?
16    A  Yes, I did.
17    Q  When you were notified that you were placed
18 back as a student -- that was that short letter that
19 was referred to -- did you put anything in writing to
20 the carrier or to the FRA at that time complaining
21 about being put back as a student?
22    A  No, I didn't because --
23        MR. RADEK: I have an objection to that
24 question, Scott. I think the testimony was that
25 he was put back as a fireman.

27

1    Q  Did you violate the hours of service?
2    A  No.
3    Q  Okay. I don't believe you gave him a copy of
4 this letter. This was entered yesterday as an exhibit.
5 Exhibit 7. Is that what that shows?
6    A  Yes.
7    Q  Do you remember this ride with Mr. Kifer --
8    A  I remember riding --
9    Q  -- of December 14th?
10    A  I remember riding with him, not everything,
11 but I remember riding with him -- he rode with me on
12 that trip, yes.
13    Q  Okay. Did you object to his statements in
14 this letter concerning your deficiencies?
15    A  Yes, I do.
16    Q  Did you put anything in writing to him?
17    A  No, I did not.
18    Q  Going to the third bullet point from the
19 bottom, it talks about you passing a clearance point
20 sign by nearly two engine lengths. Did you pass, or
21 did he make this up?
22    A  I promise you I do not recall, and it seemed
23 like if -- well, I'll just say I don't recall.
24    Q  You brought up -- well, one more thing here.
25 I'd like to make this as an exhibit.

26

1    Q  (By Mr. Hinckley) Okay. I'm going to refer
2 you to the second page. Would you read the last
3 sentence there?
4    A  You will receive a student engineer license.
5 You will be placed in engineer -- you will be placed
6 with an engineer for approximately 30 days and then
7 reevaluated.
8    Q  Okay. So you received a student engineer
9 license?
10    A  Yes.
11    Q  Okay. Did you object to the carrier or the
12 FRA at that time about receiving a new student engineer
13 license?
14    A  No.
15        MR. HINCKLEY: Dan, I don't think I have
16 further questions. If you have some?
17        MR. ALPERT: I do. I think you had covered
18 the essential points.
19        FURTHER CROSS-EXAMINATION
20 BY MR. ALPERT:
21    Q  Just to recap, Mr. Daniels, I'm Dan Alpert,
22 an attorney with the Federal Railroad Administration
23 and co-respondents in this matter with the Union
24 Pacific Railroad Company. You know, again, just to
25 clarify for the record, you know, we have letters

28

**[Page 29]**

1  you've seen.  There's one, Union Pacific dated
2  September 8th, 1999, which Mr. Hinckley just mentioned.
3  There's a letter dated December 14th, 1999, from a
4  Mr. Kifer, another letter dated February 7, 2000, from
5  Mr. Breeden, and these letters all take issue with your
6  ability to operate a train.  And you know, we have
7  nothing we've seen in writing questioning that
8  determination, challenging that until -- I was asking,
9  Mr. Daniels, I believe, if he had anything in writing,
10  anything to show that the record questioning the
11  determinations that were made in the letters I cited,
12  the letters of September 8th, 1999, the letter of
13  December 14, 1999, and the letter of February 7, 2000,
14  whether he had anything to submit -- had submitted
15  questioning those determinations, any record
16  challenging that?
17       A    Yes, I believe I did talk to the union
18  representative on the west end, and I'm trying to see
19  if I have that letter with me.  I have a letter right
20  here from the union representative Cletus on that end.
21  And it says here, Chuck, you need to write your local
22  chairman and ask him if this is legal.  You can do it
23  the following way:  Sir, I was promoted to locomotive
24  engineer on certain date.  After working the different
25  zones in North Little Rock/Pine Bluff hub, I was forced

29

**[Page 30]**

1  to take an engineer's job in zone two.  While making my
2  qualification trip with a pilot, MDP Kifer rode with me
3  and said I was not qualified to be an engineer in zone
4  two.  Since that time, I have had my engineer license
5  revoked.  I would like you to look into this matter and
6  advise me as to my legal assessment on this.  You
7  should also state any questions that you have on this.
8  Your seniority should not change, but I really don't
9  know.  The engineering promotion was done under the UTU
10  agreement.  Signed Cletus.
11       Q    What's the date of that letter?
12       A    I have no date on it.  He didn't put a date
13  on it.
14       Q    When do you recall receiving it?
15       A    I received it --
16       Q    After February 7, 2000?
17       A    I received it -- I would say I received it --
18  I can't recall right now.  I'm trying to think of this
19  right now.
20       Q    Okay.  Again, with these letters that I
21  mentioned, the three letters from Union Pacific, you
22  know, it shows UP had made this determination in
23  writing about your ability to operate a train.  Do you
24  think that the UP, you know, did not provide you enough
25  notice as to your deficiencies, that they believed your

30

**[Page 31]**

1  deficiencies -- I mean, were you in any way, you know,
2  concerned that you weren't given enough information as
3  to what you were doing wrong?
4       A    Let's say that I don't agree with the way the
5  UP company superintendents went about this.  Of course
6  I was surprised when Larry Breeden came down to give me
7  a qualification check ride.
8       Q    But from the letter of September 8th and the
9  letter of December 14th, which you received, you're not
10  saying that you weren't aware that the Union Pacific
11  had concerns about your ability to operate a train?  I
12  mean, you received notice of their concerns, right?
13       A    I can see the concerns, yes, by Steve Kifer
14  and Larry Breeden, who were coworkers and partners, and
15  they worked together up on the west end.
16       Q    Okay.
17            MR. ALPERT:  Well, I really have nothing
18  further to add at this point.
19            MR. RADEK:  I have a further question or two.
20            REDIRECT EXAMINATION
21  BY MR. RADEK:
22       Q    Yesterday we entered an Exhibit 4, Charles.
23  That was a photocopy provided by the Union Pacific
24  Railroad of your class one certification.  Do you
25  recognize the photocopy?

31

**[Page 32]**

1       A    Yes, I do.
2       Q    Okay.  Does that card indicate that you were
3  promoted to class one locomotive engineer on or about
4  July 14th of 1999?
5       A    That's correct.
6       Q    And did you, in fact, work as a class one
7  promoted locomotive engineer after September 15th of
8  1999?
9       A    Yes, I did.
10       Q    And did you make, in fact, several trips over
11  the next two months as a promoted class one locomotive
12  engineer?
13       A    I did.
14            MR. RADEK:  All right.  Thank you.  I don't
15  have any further questions.
16            MR. HINCKLEY:  I don't have any.  Dan?
17            MR. ALPERT:  None.  I guess I don't -- well,
18  before I say that, I would like to go off the
19  record with you, Scott.  I'm not sure how we can
20  do that, but if I can call you in your office.
21            MR. HINCKLEY:  I can call you from an outside
22  office.
23            (An off-the-record discussion was held.)
24            (Recess)
25            MR. ALPERT:  I have no questions.  I just

32

1  wanted to clarify something, maybe there was some
2  static on the phone coming through the last point,
3  but again, I have no questions.
4      MR. RADER:  Okay.  We have no further
5  questions.
6      (Whereupon, the deposition was concluded at
7  10:48 a.m.)

---

STATE OF NEBRASKA    )
                     ) ss
COUNTY OF DOUGLAS    )

    I, Bobbi M. Randall, RPR, a General Notary
Public in and for the State of Nebraska, do hereby
certify:

    That prior to being examined, the witness
named in the foregoing deposition, CHARLES L.
DANIELS, was by me duly sworn to testify to the
truth, the whole truth, and nothing but the truth;

    That said deposition was taken before me at
the time and place set forth and was taken down by
me in shorthand and thereafter reduced to
computerized transcription under my direction and
supervision, and I hereby certify the foregoing
deposition is a full, true, and correct transcript
of my shorthand notes so taken.

    I further certify that I am neither counsel
for nor related to any party to said action nor in
any way interested in the outcome thereof.

    IN WITNESS WHEREOF, I have hereunto
subscribed my name this October 30th, 2002.

_____
Bobbi M. Randall, RPR
General Notary Public

dynamic 6.10, 7.4, 7.5, 7.7, 24.18 .

< E >
E 2.17 .
Earlier 16.3, 17.16, 18.6, 19.1, 24.2 .
easier 9.7 .
eight 19.11, 19.15, 21.12 .
end 5.11, 5.20, 27.7, 29.18, 29.20, 31.15 .
engine 7.13, 7.16, 26.20 .
engineer's 8.15, 12.9, 13.2, 30.1 .
engineering 18.10, 30.9 .
Engineers 2.14, 8.1, 16.14, 16.21, 22.10 .
engines 7.14 .
enough 30.24, 31.2 .
entered 5.1, 14.3, 14.15, 16.4, 26.4, 31.22 .
entirely 8.19 .
entries 5.7, 5.11 .
EQAL 1:14 .
essential 28.18 .
evaluation 14.23 .
eventually 3.12, 12.13 .
everything 28.10 .
evidently 12.23, 13.20 .
exactly 11.18 .
EXAMINATION 2.27, 2.30, 3.15, 31.20 .
examined 3.3, 34.7 .
found 13.23 .
exception 26.7, 25.12 .
Exhibit 3.23, 3.24, 4.25, 5.1, 5.6, 10.6, 10.19, 14.2, 14.3, 14.16, 28.12, 14.16, 18.13, 19.17, 21.10, 22.5, 22.7, 23.21, 24.2, 28.4, 28.5, 26.25, 27.3, 31.22 .
Exhibits 2.30, 3.21, 3.22, 15.21 .
experience 9.10, 10.18, 27.7 .
explain 8.5, 10.18, 27.7 .
explained 10.12 .
explaining 8.24 .
explains 14.22 .
exposed 9.16, 17.13 .

< F >
fact 5.12, 32.6, 32.10 .
facts 3.18 .
failed 14.23, 15.3 .
familiar 9.5, 10.1, 23.11 .
familiarization 5.22 .
fast 24.8 .
February 14.16 .
Federal 1.2, 28.22 .
felt 11.22, 11.22, 13.24 .
few 17.19 .
find 12.21 .
fireman 11.3, 11.6, 12.3, 12.6, 12.24, 19.17, 20.4, 27.25 .
fireman's 12.8 .
firemen 20.9, 20.10, 20.14 .
first 3.3, 3.18, 5.7, 5.9, 5.21, 5.22, 5.24, 13.5, 14.11, 14.11, 15.2, 15.18, 17.18, 18.13, 21.11, 21.11, 21.12, 21.19, 22.21, 23.12 .
first 15.22, 17.13 .
firsthand 20.13 .
five 6.3, 12.18, 15.14, 23.8 .
follow 16.2 .
follow-up 3.16 .
following 29.23 .
follows 3.4 .
forced 29.25 .
foregoing 34.8, 34.15 .
forgotten 8.14 .
Fort 5.20 .
forth 34.12 .
found 13.23 .
four 6.3, 22.1 .
fourth 32.1 .
FRA 2001-9837 1.12 .
front 7.14, 15.21 .
full 34.16 .
fully 8.17, 11.7 .

< G >
give 28.3 .
General 1.23, 34.4, 34.27 .
generally 6.20 .
getting 12.2, 12.4, 12.5, 19.21, 23.11 .
give 31.6 .

< H >
half 19.10, 19.16, 21.19 .
hand 22.4 .
handling 13.24, 24.24 .
happened 11.14, 13.4 .
happening 11.12 .
Headquarters 1.20 .
Hearing 1.9, 22.11, 22.15 .
held 32.23 .
help 7.16, 10.16, 13.6, 18.11 .
helps 9.7 .
Hereby 34.15, 34.15 .
hereunto 34.21 .
hill 7.17, 23.14 .
hills 9.17 .
him 22.25 .
Hinckley 2.9, 22.9, 15.25, 22.9, 22.23, 23.1, 27.5, 29.2 .
hire 16.7, 16.9 .
hour 24.6, 24.7, 24.12 .
hours 25.16, 25.17, 25.23, 25.24, 25.25, 26.1 .
hub 29.25 .

< I >
identification 22.8, 27.4 .
identifiers 6.11, 8.13 .
Idle 18.17 .
immediately 4.22 .
incorrect 24.15, 24.16, 24.20 .
independent 15.11 .
indicate 32.2 .
information 13.19, 23.16, 27.7, 31.2 .
initially 19.9 .
instructor 19.21 .
interested 34.20 .
interrupt 8.22 .
issue 29.5 .
Issues 2.21, 22.12, 22.15, 22.14, 22.15, 22.16 .
item 21.22, 22.23, 23.3 .

< J >
job 5.18, 8.6, 9.7, 9.9, 17.6, 30.1 .
jobs 5.17, 17.9 .
July 5.9, 5.16, 5.18, 5.25, 5.25, 8.7, 6.16, 10.6, 19.9, 19.14, 21.18, 32.4 .
June 4.1 .

< K >
K 2.16 .
Kifer 10.11, 10.14, 11.15, 11.21, 13.1, 13.17, 13.22, 14.12, 26.7, 29.4, 30.2, 31.13 .
kind 5.1, 13.19, 23.10 .
Knob 24.12 .
knowledge 9.9, 14.11, 20.13 .
knowledgeable 17.10 .

< L >
L 1.17, 1.19, 2.25, 3.1, 34.8 .
L198 18.19, 18.21 .
language 27.6 .
Larry 3.10, 14 17, 31.6, 31.14 .
last 5.5, 14.7, 28.2, 33.2 .
later 19.11 .
lead 7.20 .
learn 9.9, 9.13, 10.2, 17.6, 17.7, 19.5 .
learned 24.24 .
learning 9.10, 9.12, 18.2, 19.18, 19.19, 19.20 .
least 22.1 .
leg 9.25 .
legal 29.22, 30.6 .
lengths 26.20 .
less 12.8 .
letter 13.19, 13.22, 14.4, 14.11, 14.17, 14.21, 14.25, 15.3, 24.1, 24.4, 25.10, 24.24, 27.14, 28.12, 29.3, 29.4, 29.12, 29.13, 29.19, 29.19, 30.11, 30.18, 31.9 .

letters 15.21, 28.25, 29.5, 29.11 .
29.12, 30.20, 30.21 .
license 13.22, 14.9, 25.21, 28.4 .
28.9, 28.13, 30.4 .
lie 8.3, 8.3, 8.4, 8.5, 6.6, 10.19, 11.9, 18.16 .
Little 6.10, 6.19, 21.4, 29.25 .
LL101 3.27 .
local 29.21 .
locations 24.20 .
Locomotive 1.5, 2.14, 3.13, 3.19, 4.5, 4.17, 7.20, 7.20, 8.25, 12.10, 12.14, 13.11, 22.10, 29.23, 32.3, 32.7, 32.11 .
long 6.11, 8.14 .
longer 11.11, 12.23, 13.15, 13.21, 14.13 .
look 5.7, 5.11, 14.2, 17.22, 18.16, 19.13, 21.10, 30.5 .
looked 13.6, 24.2 .
looking 5.5, 5.15, 10.6 .
looks 21.11 .
lose 23.10 .
lot 17.14, 17.15, 23.15 .

< M >
M 1.22, 1.35, 34.4, 34.26 .
management 13.14, 20.19 .
manual 20.1, 20.23, 20.25, 21.1, 21.2 .
mark 22.4 .
marked 22.7, 27.3 .
MATHESON-TALLBORG-DENN 21.23, 22.5 .
matter 28.23, 30.5 .
mean 5.25, 8.22, 9.16, 15.20, 31.1, 31.12 .
memory 13.6, 18.11 .
mentioned 11.23, 29.2, 30.21 .
miles 24.5, 24.7, 24.12 .
minimum 12.18, 15.15 .
moments 2.11, 19.15, 23.5 .
MOP 30.2 .
morning 3.7, 3.8 .

once 23.9 .
one 3.11, 3.19, 3.22, 4.5, 4.14, 4.23, 5.5, 5.13, 7.13, 8.3, 8.7, 10.8, 11.10, 13.15, 13.20, 14.13, 17.17, 23.3, 23.10, 23.22, 24.9, 25.24, 29.1, 31.24, 32.3, 32.6, 32.11 .
Ontario 2.18 .
operate 22.6, 29.6, 30.23, 31.11 .
operated 24.12 .
operating 7.19 .
others 16.3 .
outcome 34.20 .
outside 8.12, 32.21 .
own 4.18 .

< P >
Pacific 1.20, 1.37, 27, 28.24, 29.1, 30.21, 31.10, 31.23 .
Page 2.25, 5.15, 10.19, 18.14, 21.11, 21.15, 21.19, 28.2 .
pages 5.6 .
paid 12.2, 12.10, 20.3, 20.5 .
Part 2.43, 13.5, 24.24, 27.1, 27.2 .
particular 4.7, 10.4, 14.20, 23.23 .
parties 15.8 .
partners 31.14 .
party 34.19 .
pass 26.20 .
passing 14.21, 26.19 .
past 16.7 .
paths 20.15 .
pay 11.6, 12.2, 12.4, 12.5, 12.13, 20.18 .
paying 12.7 .
people 9.24 .
performance 14.21 .
Petitioner 1.9, 22.16 .
phone 33.2 .
photocopy 31.23, 31.25 .
pilot 5.22, 6.6, 6.12, 6.15, 6.19, 6.21, 6.22, 10.16, 10.16, 17.19, 19.2, 30.2 .
Pine 5.16 .
place 11.19, 34.12 .
placed 14.9, 27.17, 28.5 .

28.5 .
please 12.18 .
point 10.10, 13.18, 26.18, 26.19, 33.2 .
point 8.23, 31.18 .
points 28.18 .
portion 9.11 .
position 11.3 .
power 7.2, 7.6, 7.11, 7.12, 7.13, 7.22, 24.18 .
preference 15.17 .
pretty 23.12 .
printout 11.9, 13.7 .
Prior 8.8, 19.4, 34.7 .
probably 15.8, 25.14 .
procedure 20.8, 20.17 .
procedures 27.9 .
proceed 15.17 .
promise 28.22 .
promotable 11.2, 11.5 .
promoted 4.14, 4.16, 5.4, 5.13, 8.2, 10.8, 12.22, 12.23, 18.4, 29.23, 32.3, 32.7, 32.11 .
promotion 3.19, 30.9 .
provide 30.24 .
provided 31.23 .
Public 1.23, 34.5, 34.27 .
pursuant 1.24 .
push 7.16 .
put 11.2, 22.1, 26.16, 27.16, 27.21, 27.25, 30.12 .
putting 13.2 .

< Q >
qualification 30.2, 31.7 .
qualified 4.22, 6.9, 6.18, 8.5, 8.20, 11.5, 11.7, 11.23, 18.18, 30.3 .
Qualify 8.25, 22.22, 22.24, 23.1 .
quality 22.22, 22.24 .
question 9.3, 25.18, 27.24, 31.19 .
questioning 29.7, 29.10, 29.15 .
questions 3.16, 15.7, 15.9, 15.13, 16.21, 16.23, 17.2, 30.7, 32.15, 32.25, 33.3, 33.5 .
quick 15.13 .

28.5 .
RADEX 2.16, 2.27, 2.33, 12.17, 15.8, 32.14 .
Railroad 1.2, 28.22, 28.24, 31.24 .
ran 8.17, 8.13, 23.11, 25.22 .
Randall 1.22, 1.35, 34.4, 34.26 .
ranke 16.15, 18.23 .
rate 12.2, 12.4, 12.5, 12.8, 12.9 .
RED 18.17 .
RE90 18.20 .
reached 10.10 .
read 22.25, 28.2 .
reading 27.6 .
really 8.6, 30.8, 31.17 .
rear 7.13, 7.16, 7.17 .
reason 8.8, 19.4, 23.7, 25.14 .
rebut 27.7 .
recall 8.8, 8.12, 24.7, 26.22, 26.23, 27.12, 27.12, 30.14, 30.18 .
recap 23.24, 28.21 .
receive 13.19, 28.4 .
received 13.22, 14.12, 15.3, 27.14, 28.8, 30.15, 30.17, 30.17, 31.9, 31.12 .
Recess 12.18, 12.19, 15.9, 16.12, 16.23, 32.24 .
recognize 31.25 .
record 12.20, 28.25, 29.10, 29.15, 32.19 .
REDIRECT 2.33, 31.20 .
reduced 34.13 .
reevaluated 14.10, 28.7 .
refer 18.17, 18.19, 28.1 .
referred 27.19 .
refers 14.20, 22.21, 23.2, 23.1 .
refresh 18.11 .
regular 8.6, 9.6 .
related 34.19 .
remember 4.7, 4.8, 4.21, 4.22, 5.17, 11.20, 11.24, 12.3, 13.4 .

14.25, 24.14, 28.7, 28.8, 28.10, 28.11 .
removed 22.5 .
removed 14.22 .
report 3.25, 4.12 .
reports 3.21 .
representative 23.18, 29.20 .
requested 17.18 .
required 34.18 .
requirement 26.3 .
requires 24.19 .
respond 25.10 .
responsibilities 9.9, 17.6, 17.9 .
rest 10.24 .
restricted 25.3 .
restriction 24.6, 24.11 .
returned 12.25 .
revoked 30.5 .
revolted 13.1 .
RICHARD 2.15 .
Rick 22.21 .
ridden 13.22 .
ride 3.20, 3.24, 20.9, 20.17, 26.7, 30.22 .
sic 13.1 .
ride 4.24, 5.21, 5.21, 5.22 .
riding 26.8, 26.10, 26.11 .
road 9.20, 9.12, 9.20, 9.22, 9.25, 16.8, 16.10, 16.11, 17.15, 17.25, 23.14 .
Rock 4.10, 5.16, 21.4 .
Rockplane 29.25 .
rode 13.11, 4.4, 21.3, 26.11 .
30.2 .
Roman 22.21, 23.2 .
ROSS 2.17 .
RPR 1.22, 1.35, 34.4, 34.26 .
rule 24.19, 24.7 .
run 8.9, 19.25, 25.24 .

< S >
saying 8.18, 9.24, 13.22, 15.3, 16.9, 24.14, 25.22, 31.10 .
says 14.7, 24.17, 25.1 .
29.21 .
school 18.3, 24.25 .
scored 4.13 .
Scott 2.6, 27.24, 32.19 .
seal 19.22, 20.18 .

second 7.19, 17.23, 28.2 .
seconds 24.19, 24.21 .
24.23 .
section 20.16 .
seemed 28.22 .
seen 29.1, 29.7 .
sending 7.15, 7.17 .
seniority 30.8 .
sentence 14.6, 28.3 .
September 5.11, 6.16, 13.8, 13.11, 13.12, 14.4, 22.17, 29.2, 29.12, 31.6, 32.7 .
sense 18.17, 21.16, 21.23, 27.21, 28.4, 28.8, 28.12 .
service 8.9, 14.22, 28.1 .
set 34.12 .
several 16.7, 23.5, 23.13, 24.20 .
32.10 .
sheet 17.17 .
short 27.18 .
shorthand 34.13, 34.17 .
show 23.24, 29.10 .
showing 19.17 .
shows 4.12, 17.17, 23.25, 26.5 .

sic 13.1 .
side 19.23 .
siding 24.11 .
signal 29.14 .
signature 7.15, 7.17 .
Signed 30.10 .
Sir 29.23 .
sit 19.23 .
six 6.4, 6.5 .
skills 14.21 .
slow 7.17 .
Smith 5.20 .
sooner 17.14 .
specific 24.3 .
specifically 5.17 .
speed 24.6, 24.11, 25.3 .
sic 34.2 .
standard 20.8, 20.17 .
start 4.17, 15.17, 16.1 .
started 9.21, 10.5, 19.8 .
starting 6.15 .
State 1.23, 30.7, 34.1, 34.5 .
Statement 2.41, 19.1, 22.12, 22.13, 22.14, 22.16, 22.18 .

24.15 .
statements 28.13 .
STATES 1.1 .
static 33.2 .
steps 12.10 .
Steve 10.14, 13.1, 13.22, 31.13 .
Stipulations 22.9 .
Street 1.22, 1.37, 2.10, 2.18 .
student 6.3, 7.25, 8.1, 10.20, 10.25, 11.16, 12.3, 13.3, 14.6, 18.1, 18.9, 18.24, 27.18, 27.21, 28.4, 28.8, 28.12 .
students 19.24, 19.25, 23.16 .
subject 19.14 .
submitted 3.21, 29.14 .
subscribed 34.22 .
Suite 2.4 .
superintendents 31.5 .
supervision 34.15 .
supervisor 4.4 .
surprised 31.6 .
switch 9.18, 9.18, 18.19 .
switchmen/brakemen 8.10, 18.9 .
switchman 16.22 .
sworn 3.3, 34.9 .

< T >
talked 11.4 .
take 24.4, 28.19 .
ten 21.13 .
territories 8.13, 23.8, 23.17 .
test 23.18 .
testified 3.4, 23.4, 24.5, 24.10 .
testify 34.9 .
testimony 19.16, 27.24 .
There's 4.13, 21.16, 28.1 .
29.3 .
thereafter 34.13 .
thereof 34.20 .
thinking 8.1, 6.2 .
third 27.18, 28.18 .
three 5.5, 5.21, 5.22, 5.24, 25.2, 30.21 .
throughout 23.5 .

tired 25:17.
together 31:15.
took 4:20, 7:25, 8:2, 8:6, 8:24,
  11:18, 18:12, 23:18.
top 23:22.
towards 21:5, 27:6.
track 9:18, 9:18, 17:7, 18:2, 19:9,
  19:18, 19:19.
train 3:20, 3:24, 6:7, 6:9, 6:10,
  6:10, 6:25, 7:1, 7:14, 7:15,
  7:16, 8:13, 9:14, 13:24, 19:23,
  24:24, 25:22, 25:24, 25:6,
  30:23, 31:11.
trainer 19:21.
training 8:15, 9:21, 9:22, 10:13,
  11:11, 11:24, 12:1, 16:5, 16:7,
  16:8, 16:10, 16:12, 16:13,
  16:25, 17:1, 17:4, 17:15.
trains 5:2, 5:4, 8:13.
transcript 34:16.
transcription 34:14.
TRANSPORTATION 1:1.
traveling 24:6.
trip 3:25, 4:3, 4:7, 4:9, 4:13, 4:14,
  4:16, 5:9, 6:15, 12:25, 13:23,
  21:20, 21:23, 23:13, 24:8,
  25:15, 25:17, 26:12, 30:2.
True 7:21, 16:6, 17:12, 17:21,
  20:24, 34:16.
truth 34:10, 34:10, 34:10.
try 11:8.
trying 4:19, 29:18, 30:18.
Tuesday 1:21.
turn 18:13.
turning 21:18, 21:22.
two 7:14, 8:16, 8:18, 22:23, 23:3,
  28:20, 32:11.
two-and-a-half 8:16, 8:19.
two. 30:1, 30:4, 31:19.
.
.
< U >.
Um-hum 6:8.
unacceptable 13:25.
understand 11:8.
understanding 11:13, 17:10.
unfamiliar 6:23, 7:3.
unfamiliarity 6:20.
Union 1:20, 2:7, 11:4, 12:9,
  27:11, 27:15, 28:23, 29:1,

28:17, 29:20, 30:21, 31:10,
  31:23.
UNITED 1:1.
until 28:8.
Ups 9:17.
uses 22:21.
.
< V >.
vacation 4:21.
vaguely 4:8, 11:20, 11:24.
Vermont 2:4.
violate 28:1.
violates 28:1.
visualize 4:19.
.
< W >.
waited 24:19, 24:23.
wanted 10:15, 11:15, 11:21.
  11:23, 33:1.
wanting 12:24.
warrants 9:18, 9:19, 17:8, 18:2.
Washington 1:3, 2:5.
week's 4:21.
west 5:20, 29:18, 31:15.
Whereas 7:14, 9:8, 9:11,
  9:14.
WHEREOF 34:21.
Whereupon 33:6.
whether 29:14.
whole 34:10.
will 14:8, 14:9, 15:8, 18:17,
  19:23, 28:4, 28:5, 28:5.
within 1:23.
WITNESS 3:2, 15:12, 34:7,
  34:21.
word 22:22.
words 15:18.
work 3:23, 10:5, 12:24, 32:6.
worked 5:4, 8:12, 8:19, 10:7,
  31:15.
working 4:17, 5:13, 8:10, 11:1,
  11:10, 12:22, 13:10,
  29:24.
works 3:11.
write 25:5, 29:21.
writing 25:7, 26:16, 27:8, 27:19,
  29:7, 29:9, 30:23.

wrote 25:8.
Wynne 4:10, 4:11, 4:12.
.
< X >.
X344 18:19, 18:21.
.
< Y >.
yard 5:16, 5:18, 8:10, 8:12, 8:19,
  9:4, 9:15.
year 18:10, 19:15.
years 8:16, 8:19, 9:12, 18:8.
Yesterday 3:9, 3:16, 3:21, 5:1,
  7:24, 14:3, 14:15, 23:21, 24:1,
  24:5, 24:10, 26:4, 31:22.
yesterday's 3:23.
.
< Z >.
zone 30:1, 30:3.
zones 29:25.
.
< Dates >.
december 14, 1999 29:13.
  29:13, 29:13.
february 7, 2000 29:4, 29:4,
  29:4, 29:13, 29:13, 29:13,
  30:16, 30:16, 30:16.
october 8, 2002 1:22, 1:22,
  1:22.

APR 15 2004 15:50 FR SUPPORT SERVICES    402 271 5326 TO 912024936068    P.02/09

Government Exhibit 2



2001 APR 16  A  9:50

## U. S. DEPARTMENT OF TRANSPORTATION
### FEDERAL RAILROAD ADMINISTRATION
### WASHINGTON, D. C.

---

## FRA-LOCOMOTIVE ENGINEER CERTIFICATION CASE
### C. L. DANIELS, HEARING PETITIONER
### DOT DOCKET NO. FRA-2001-9837
### (Formerly FRA DOCKET NO. 00-51)
### JOINT STIPULATION OF MATERIAL FACTS

---

The parties by and through their representatives, Despres, Schwartz & Geoghegan, the Union Pacific Railroad Company (UP), and the Federal Railroad Administration (FRA) hereby agree to stipulate to the following material facts:

1. Union Pacific ("UP") hired Mr. Charles Daniels ("Petitioner') as a switchman or brakeman, and he continued to be employed as a switchman or brakeman until he entered UP's engineer certification training program. *Daniels Deposition, Transcript at 8.*

2. Petitioner entered UP's student engineer certification program on August 31, 1998.

3. Petitioner completed UP's engineer certification classroom training with an acceptable score.

4. Generally, student engineers receive train service certification after completion of approximately 80 to 100 training rides over a six-month period. The training period may be extended if a student engineer cannot pass the skills test. *Breeden Deposition, Transcript at 23, 24 and 33.*

5. Over the 10-month period between September 4, 1998 and July 12, 1999, Petitioner completed 145 trips as a student engineer, while accompanied by an engineer trainer and a conductor.    *See Breeden Deposition, Exhibit 1 and Transcript at 23.*

6. Petitioner believes that it took him longer to be qualified on skills performance because his "only job prior to going into the engineer service was a switchman/brakeman only in the yard [and therefore] . . . [he] had never worked [over] . . . any of these territories . . . ." *Daniels' Deposition, Transcript at 8 – 10.* In addition, Petitioner notes that prior to entering engineer training he had never been on the road nor did he ever take conductor-training classes.    *Daniels' Deposition, Transcript at 16.*

7. On June 10, 1999, Mr. D. C. Donham, Manager of Operating Practices, notified Petitioner that he was promoted to a train service engineer, after receiving a passing score of ninety-four (94) on his certification ride. *Breeden Deposition, Exhibit 9 at 6, and Transcript at 34; and Daniels' Deposition, Transcript at 4.* Engineers need a score of at least 80 to pass a skills performance test.    *Breeden Deposition, Transcript at 27.*

8. Petitioner made thirty (30) trips as a train service engineer between July 17, 1999 and September 7, 1999. *Breeden Deposition*, Exhibit 1 (2nd report). The report showing Petitioner was the engineer of record on these 30 trips does not indicate whether Petitioner had a pilot to assist him. *Breeden Deposition, Transcript at 9 and 31.*

2

9. On September 3, 1999, Mr. S. E. Kifer, Senior Manager of Operating Practices for Union Pacific in Van Buren, Arkansas, evaluated Petitioner on a performance ride, and gave him what UP deemed to be a failing score of seventy-six (76). *Breeden Deposition, Transcript at 27 and Exhibit 8.* Petitioner was notified by crew management that he was no longer a class one engineer. *Daniels Deposition, Transcript at 13.*

10. By unsigned letter dated September 8, 1999, Mr. Kifer wrote that "[o]n evaluation September 3, 1999, while working as Engineer on MCBNL-31, you failed to meet requirements of Class One Engineer." Mr. Kifer also notified Petitioner that due to Petitioner's test failure of September 3, 1999, Petitioner "will be receiving a Student Engineer license [sic], will be placed with an Engineer for approximately 30 days, and then be reevaluated." *Breeden Deposition, Exhibit 6.*

11. Petitioner did not object to UP or FRA regarding receipt of the student engineer certificate as set forth in Mr. Kifer's letter of September 8, 1999. *Daniels Deposition, Transcript at 28.* However, through his union, Petitioner requested that he get paid at the rate for a locomotive engineer, instead of the fireman's rate UP had switched him to, and UP agreed to that higher rate of pay. *Daniels' Deposition, Transcript at 12.*

12. UP considered Mr. Kifer's letter of September 8, 1999, to be notification that Petitioner's certification was being denied. *Breeden Deposition, Transcript at 13.*

3

13. Petitioner made an additional 107 trips as a student engineer between September 9, 1999 and February 3, 2000, under the supervision of a train service engineer. *Breeden Deposition, Exhibit 1 and Transcript at 25-26.*

14. On December 7, 1999, Mr. R. L. Eardensohn, Manager of Operating Practices, rode with Petitioner to test knowledge of territory and operating rules. Petitioner passed this test with a score of 100 but Mr. Eardensohn commented on the report that Petitioner's "judgment stopping a train needs to be tested." *Breeden Deposition, Exhibit 8 (2nd report).*

15. On December 14, 1999, Mr. Kifer accompanied Petitioner on a skills performance ride, and gave him what UP deemed to be a failing score of seventy-one (71). *Breeden Deposition, Transcript at 27 and Exhibit 8 (3rd report).*

16. By unsigned letter dated December 14, 1999, Mr. Kifer explained in detail to Petitioner why Petitioner failed the skills performance ride on that same date. This letter does not make any reference to 49 CFR Part 240, Federal regulations or that Petitioner's certification has been denied, suspended or revoked. *Breeden Deposition, Exhibit 7 and Transcript at 28.*

17. Petitioner did not rebut or attempt to explain, in writing, the adverse information that Mr. Kifer detailed in his December 14, 1999 letter. *Daniels Deposition, Transcript at 26 and Breeden Deposition, Transcript at 32.*

18. On February 3, 2000, Mr. J. L. Breeden, mistakenly identified on the report as the Manager of Operating Practices, accompanied Petitioner on a skills performance ride, and gave Petitioner what UP deemed to be a failing score of sixty-one (61).

4

*Breeden Deposition, Exhibit 8 (4th report).* At the time Mr. Breeden accompanied Petitioner, he was actually the Regional Director of Train Operating Practices Compliance for the Southern Region. *See Breeden Deposition, Transcript at 5 and 27.* On February 3, 2000, after Mr. Breeden rode with Petitioner, they went downstairs and Mr. Breeden asked for Petitioner's "license." *Daniels Deposition, Transcript at 25.*

19. By letter dated February 7, 2000, Mr. Breeden notified Petitioner of the specific reasons that Petitioner failed the February 3, 2000, skills performance test. Mr. Breeden stated that "I have removed you from service account failing the certification evaluation." Mr. Breeden then directed Petitioner to "contact your local chairman and advise him of these facts [so that Petitioner's local chairman could] work with Labor Relations to determine the next course of action." *Breeden Deposition,* Exhibit 5 (This exhibit contains an unsigned version of this letter with a different page break than a signed version of the letter provided by UP during discovery).

20. Petitioner did not rebut or attempt to explain, in writing, the adverse information detailed in Mr. Breeden's letter of February 7, 2000. *Daniels Deposition, Transcript at 25 and Breeden Deposition, Transcript at 32.*

21. Breeden Deposition Exhibits 8 and 9 include Mr. Breeden's handwritten notes on each train ride report. UP admits that these notes were not made contemporaneously with the actual train rides. The parties have not stipulated that these notes are accurate descriptions of the events or codes that they describe

5

and therefore the parties request that the Hearing Officer consider them to have no probative value.

22. By unsigned letter dated March 1, 2000, Mr. Jerry Everett, a UP Superintendent, terminated Petitioner's employment with UP per a collective bargaining agreement and stated that "[p]ursuant to Mr. Larry Breeden's letter of February 7, 2000, your certification as a locomotive engineer was denied due to your inability to qualify as an engineer."

23. UP's system for grading a train service engineer or a student engineer for performance evaluations, certificate evaluations, qualification on a certain territory evaluations or familiarization with a territory evaluations is a point system. There are several different evaluation categories, each assigned a maximum point value. *Breeden Deposition*, Exhibit 9. When all points in each category are added together the total maximum point value a train service engineer or a student engineer can receive on any evaluation is 100 points.

24. The parties have agreed to stipulate that the following attached documentation be included as part of the official record in this case:

   a. Deposition of Mr. Larry Breeden held in Omaha, Nebraska on October 7, 2002, including the 9 deposition exhibits. (Petitioner's Social Security number ("SSN") has been redacted).

   b. Deposition of Mr. Charles Daniels held in Omaha, Nebraska on October 8, 2002, including the 2 deposition exhibits.

6

c. Copy of unsigned letter from Jerry Everett to Petitioner dated March 1, 2000.

d. Copy of signed letter from Mr. Larry Breeden to Petitioner dated February 7, 2000.

e. A locomotive event recorder printout from Petitioner's February 3, 2000, skills performance test.

f. Other documentation, not provided as part of the deposition exhibits, which had been sent to Petitioner's union representative, Mr. C. R. Rightnowar, from Ms. Andrea Gansen, UP's Assistant Director Labor Relations, attached to a letter dated April 4, 2000. The letter from Ms. Gansen was in response to an appeal from Petitioner's Union Representative under the provisions of his collective bargaining agreement.

g. UP's "Procedures for Handling Engineers and Students Failing a Skills Evaluation," which UP retrieved from its computer system with a date stamp of January 5, 2001. UP believes that these "Procedures" are substantially the same as those in effect when Petitioner was a student engineer.

h. Exhibits A-F that Petitioner submitted to Mr. Hinckley attached to a letter dated December 11, 2003. Exhibits A-F were also filed with the Docket Clerk on December 12, 2003.

7

i. **A UP document from an MOP seminar explaining "Ride**
   **Evaluation Criteria" dated October 12, 1992.**

Respectfully submitted,

Melissa L. Porter
Attorney for Respondent
Federal Railroad Administration

W. Scott Hinckley
Attorney for Respondent
Union Pacific Railroad Company

Carol Nguyen
Attorney for Hearing Petitioner
C.L. Daniels

## CERTIFICATE OF SERVICE
### DOT DOCKET NO. FRA 2001-9837
(FRA Docket No. EQAL-2000-51)

The undersigned hereby certifies that the foregoing document, **JOINT STIPULATION OF MATERIAL FACTS,** has been served to all parties named below via certified U.S. mail, return receipt requested.

Mr. C. L. Daniels
1404 Country Club Road
Sherwood, AR 72120

W. Scott Hinckley, Esq.
Union Pacific Railroad Company
1416 Dodge Street, Room 1208
Omaha, NE 68179

Mr. Thomas H. Geoghegan
Despres Schwartz & Geoghgan
77 W. Washington Street, # 711
Chicago, IL 60602-2803

Docket Clerk
U.S. Department of Transportation
Central Docket Management System
Nassif Building, Room PL-401
400 Seventh Street, SW
Washington, DC 20590

Melissa L. Porter
Trial Attorney

4/15/04

Date

Government Exhibit 3

12/11/2003  12:28   3148950104          BLE UPCR                    PAGE  11/15

SCORE: 76          EQMS - Train Ride Detail Report -        to
                                                          (OS001R08)
Circ7: L 158  Train: MCBNL 31 Start: 09/03/99 1000 C Stop: 09/03/99 1835 C
ENG  DANIELS CL      SSN: ████████  Orig: L158  Dest: L021 Serv type: T
STUDENT: Y LDS: 000  MTYS: 000  TON: 0000000  FT: 00000  HLPR: N

Weather: CLEAR   MOP Name: KIFER SE          Mand. Review:   Date:

Evaluation Reason:  Performance:   Y    Qualification:   N
                    Certification: N    Familiarization: N

Ride Evaluation:
BELL:  P  IND. BRAKES:     P   DYN. BRAKES:   T   KNOWS TERRA:   T
RADIO: N  THROTTLE MOD.:   T   AUTO BRAKES:   N   GEN ORD/NOT:   N
HORN:  P  CALLING SIGNALS: P   CONTROLS SLACK: T  TRK WARR/BLN:  N
BOOKS: N  DEP INSP/TEST:   N   MON GAUGES:    P   REPT DEFECTS:  P
SPEED: T  SIGNAL IND:      N   SECURES UNIT:  N   MEETS SCHED:   N
SAFETY: P FUEL CONSERV:    P   HEADLIGHT:     P   ACCIDENT ALT:  N
          Acc. alert no.    :     Acc. alert no.:      Acc. alert no. :
          Acc. alert no.    :     Acc. alert no.:

Comments:

        CLASS 1

Daniels failed this ride evaluation
with a score of 76. Passing score
is 80 or higher. Daniels was
restricted to a Class 3 engineer at
this time.

Daniels was working with another
engineer on this trip. He had not
worked without the supervision of a
Class 1 engineer for several weeks.
This trip was between Van Buren, AR.
and Mareltower. AR.

WICHITA SERVICE UNIT
2645 NEW YORK STREET
WICHITA, KS 67219

CERTIFIED MAIL – Z 466 599 663
RETURN RECEIPT REQUESTED

C. L. Daniels
1404 Country Club Road
Sherwood, AR, 72120

## UNION PACIFIC RAILROAD COMPANY



NORMAN J. KIRK
Superintendent Transportation Services
(316) 268-9485

WICHITA SERVICE UNIT
2645 NEW YORK STREET
WICHITA, KS 67219

LARRY ERWIN
Director Transportation Services
(316) 268-9486

TOM STEER
Manager Administration
(316) 268-9487

September 8, 1999

CERTIFIED MAIL – Z 466 599 663
RETURN RECEIPT REQUESTED

C. L. Daniels
SSN ▮▮▮▮▮▮▮
1404 Country Club Road
Sherwood, AR  72120

Dear Mr. Daniels:

On evaluation September 3, 1999, while working as Engineer on MCBNL-33, you
failed to meet requirements of Class One Engineer.

You were deficient in throttle modulation, dynamic braking, and knowledge of territory and speed.

You will be receiving a Student Engineer license, will be placed with an Engineer for approximately 30 days, and then be reevaluated.

Sincerely,

S. E. Kifer, Sr. MOP

CC:   Norman Kirk, Superintendent
      Brigitte Hunsaker, Engineer License
      Cletus Gartman, Local Chairman Z 466 599 664
      CMS



Government Exhibit 5

To: C.L. Daniels   SS#

From: Steve Kifer   MOP Van Buren, AR

Subject: Ride evaluation on 12/14/99

This letter is a follow-up of a train ride evaluation conducted by myself on December 14, 1999. The purpose of this train ride evaluation was for qualification to operate trains between North Little Rock, AR and Van Buren, AR on the Van Buren Subdivision. During this ride evaluation you were observed operating the controls of the MKCLI-13 between Van Buren (MP495.8) and Scotia (MP426.6). The train was called for 10:01am and had 46 loads, 77emptys, 8342 tons and 7441 feet long. Motive power was the UP3635, DRGW5384, UPB4236, UP3124, and UPB4241.

During our trip I noticed the following deficiencies in your rules compliance and train handling skills from direct observation:

➢ Reduced the throttle to very low positions (1-2), then make an automatic brake pipe reduction after the slack had closed in resulting in excessive slack action.
➢ Applied dynamic brake while stopping at Dyer, AR. Then applied 40# independent brake application which nullified the dynamic brake effort, then released the independent brake. I then instructed you to apply the automatic brake in order to prevent the slack from rolling out on both ends of the train, possibly causing a train separation.
➢ Leaving Dyer, after I had talked with you about how the would react, you opened the throttle and started moving. I had to tell you to shut the throttle off so we could avoid a possible train separation.
➢ Failure to properly handle train approaching permanent speed restriction at Mulberry you applied the auto. brake with a 6# reduction then released it. Throttle modulation would have worked better at this location with less in train forces.
➢ Failure to demonstrate necessary skills when stopping train at Alix, AR. You left the throttle in run #8 until you decided to apply the auto brake. It is an ascending grade approaching the siding at Alix and the descending grade when stopping at the south end of Alix. Reducing the throttle allowing the grade to slow the train and then applying the auto brake would have been the proper train handling technique.
➢ Failed to stop at the clearance point sign at the south end of Alix, AR. You passed the sign by nearly two engine lengths.
➢ Failure to demonstrate sufficient knowledge and skills when stopping at Scotia, AR. I had to remind you that we were less than ½ mile from the siding and we needed to stop at the South end of the siding at Scotia.
➢ Failure to demonstrate the knowledge of the rules for stopping 400 feet from the clearance point at the South end of Scotia. I reminded you of this rule and reacted with a heavy brake pipe reduction resulting in slack action in the train.

During this trip you failed on numerous occasions to demonstrate the ability needed to safely operate a train over the territory between North Little Rock, AR and Van Buren, AR. It was evident that you did not plan ahead what was needed to control your train, you merely reacted to what the train was doing to you. This was your second evaluation by me in approximately 3 1/2 months. Overall I was extremely disappointed in your performance.

Sincerily,

Steve Kifer



DEPOSITION
EXHIBIT
7
10-7-02   BR

DEPOSITION
EXHIBIT
5
10-7-02  6R

February 7, 2000

C.L. Daniels

C. L. Daniels
~~Student~~
Student Engineer
1404 Country Club Road
Sherwood, AR. 72120

Dear Mr. Daniels:

I appreciate your hard work and dedication to become a locomotive engineer. You have good work and study habits, which enabled you to successfully complete the classroom training. Your rules knowledge is at an acceptable level.

You did not successfully pass the skills performance test conducted on February 3, 2000 on train ZMXYC 02 from Bald Knob to Dexter Jct. I must ensure all locomotive engineers are rules and skills competent. The ride evaluation included the following exceptions. You operated the train at 19 miles per hour over a 10 mile per hour speed restriction in the siding at Bald Knob. You moved the throttle lever two and sometimes three notches at a time at White River, South Newport and North Newport. The time required moving from power to dynamic braking is 20 seconds and you waited only 6 seconds at several locations including the locations above and Poplar Bluff and Dexter. The engineer and I had to remind you three times of the rule requirement while moving at restricted speed. You did stop before passing the red flag near Newport but only after I instructed you that you must be prepared to stop in one half the range of vision. You also failed to acknowledge the red flag with the required whistle signal. The slack in the train was not controlled at the stop signal at South Newport, North Newport or Diaz Jct. You also applied 70 pounds of independent brake to stop at South Newport. You stacked the air at multiple locations including the stop at Daiz Jct. and the permanent speed restriction at Walnut Ridge. You also failed to control the slack at Neelyville and Dexter. You did not know the territory at Alicia, Delaplaine, or Peach Orchard. The train was controlling your actions at all Stop signals and while operating at restricted speed, you also did not understand train – track dynamics as it relates to in train forces. In general you did not control this train in accordance within the rules and train handling practices. The train was made up entirely of intermodal equipment with 57 loads, 4407 tons, and 5700 feet.

We have the obligation to require all locomotive engineers be proficient in rules knowledge and application of those rules as well as skills performance. You have many talents, which we discussed after the trip was completed. I have removed you from service account

3-7

failing the certification evaluation. Please contact your local chairman and advise him of these facts. He can work with Labor Relations to determine the next course of action.

Sincerely,

Larry Breeden

3-8

Government Exhibit 7

MARCH 1, 2000

CERTIFIED MAIL NO. Z 499 175 483
RETURN RECEIPT REQUESTED

MR. C. L. DANIELS
1404 COUNTRY CLUB ROAD
SHERWOOD, AR 72120

YOUR SSN:

DEAR MR. DANIELS:

PURSUANT TO MR. LARRY BREEDEN'S LETTER OF FEBRUARY 7, 2000, YOUR CERTIFICATION AS A LOCOMOTIVE ENGINEER WAS DENIED DUE TO YOUR INABILITY TO QUALIFY AS AN ENGINEER.

THEREFORE, IN ACCORDANCE WITH THE TRAINING AGREEMENT DATED JULY 19, 1972, AS AMENDED ON AUGUST 25, 1978, AND OCTOBER 31, 1985, YOU HAVE FORFEITED YOUR SENIORITY AND YOUR SERVICE WITH THE CARRIER IS TERMINATED.

SINCERELY,

JERRY EVERETT

CC:    C. R. RIGHTNOWAR
       R. E. KARSTETTER
       CMS — OMAHA, NE


EXHIBT 2



Government Exhibit 8 51

**BEFORE THE**
**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL RAILROAD ADMINISTRATION**
**LOCOMOTIVE ENGINEER REVIEW BOARD**

**PETITION FOR REVIEW – DENIAL OF CERTIFICATION**
**OR RECERTIFICATION**
**PURSUANT TO 49 CFR 240.403 (c)**

| | | |
|---|---|---|
| Parties | ) | **C. L. Daniels** |
| To The | ) | **1404 Country Club Road** |
| Dispute | ) | **Sherwood, AR  72120** |
| | ) | |
| | ) | **v.** |
| | ) | |
| | ) | **Union Pacific Railroad Company** |
| | ) | **1416 Dodge Street** |
| | ) | **Omaha, Nebraska  68179** |
| | ) | |

*(stamp, right margin:)* FEDERAL RAILROAD ADMIN. OFFICE OF CHIEF COUNSEL 00 AUG -2 AM11: 14

**STATEMENT OF FACTS**

Engineer C. L. Daniels (SSN: ████████), Petitioner herein, was certified as a

Locomotive Engineer on July 14, 1999, with an expiration date of July 26, 2000.

However, by letter dated February 7, 2000, Petitioner Daniels was advised by

Respondent's Director   Train Operating Practices   Larry Breeden that he did not

successfully pass a skills performance test (copy attached hereto for ready reference as

Exhibit No. 1).  Based on this decision, Respondent's Superintendent Jerry Everett, by

letter dated March 1, 2000, terminated petitioner Daniels (copy attached hereto for ready

reference as Exhibit No. 2).   In recapping the Respondent's position, Andrea Gansen,

Respondent's Director Labor Relations stated that "…Mr. Daniels was required to qualify

1

as an engineer on a new territory. He failed to do so…" (copy attached hereto for ready reference as Exhibit No. 3). The Brotherhood of Locomotive Engineers ("BLE") filed a claim dated March 16, 2000, "…for immediate reinstatement, payment of all lost time at Engineer's rate of pay, immediate restoration of FRA Locomotive Engineer's License, a basic day penalty for each day improperly withheld from service, with vacation and seniority rights unimpaired for Engineer C. L. Daniels account improperly removed from service and improper suspension and revocation of FRA Engineer's License." (copy attached hereto as Exhibit No. 4). Additional correspondence is attached hereto as Exhibit No. 5

At no time during the handling of this matter did the Respondent provide the Petitioner with a notice or hearing as to his alleged failure to become certified or recertified. At no time during the handling of this matter, did the Petitioner have an opportunity at a hearing to present evidence as to his qualification to operate trains on the new territory, or the old territory upon which he was first certified as a locomotive engineer, including yard service.

## ARGUMENT

The right to hold a specific private employment, and to follow a chosen profession, free from unreasonable government interference, comes within the "liberty" and "property" concept of the Fifth Amendment to the U.S. Constitution. Green v. McElroy, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411 (1959). When this "liberty" / "property" right in continued employment is threatened by governmental action, or, as here, an interplay of governmental and private action, due process requirements, both procedural and substantive, attach. Cleveland Board of Education v. Loudermill, 470

2

U.S. 532, 105 S.Ct. 1487, 1493 (1985). The right to notice and a meaningful opportunity to be heard in one's own defense, are at the core of the due process requirements. Id. The Due Process Clause requires provision of a hearing "at a meaningful time." 470 U.S. at 547, 105 S.Ct. at 1496. In the instant case, where the Respondent acted under color of governmental authority, the due process rights, guaranteed to the Petitioner, were completely denied.

The First Division, National Railroad Adjustment Board, has long held that seniority to work in one's craft is a valuable property right. Award No. 351, N.R.A.B. (1st Div. Swacker, 1935) (attached hereto as Exhibit No. 6), Award No. 4230, N.R.A.B. (1st. Div. Swacker, 1939) (attached hereto as Exhibit No. 7).

In a similar case, the Locomotive Engineer Review Board found that Engineer Enoch G. Butler's certification was improperly revoked by the Southeastern Pennsylvania Transportation Authority (SEPTA):

> (6) Apparently, on March 24, 1992, Stephen J. Bruno, General Chairman of the Brotherhood of Locomotive Engineers, acting as Petitioner's representative, demanded in writing, that SEPTA convene a hearing in accordance with 49 CFR Part 240.307. This written demand was made in a letter to Mr. James Palmer, Assistant General Manager of SEPTA. Included in this letter was the request that "the carrier immediately make available, to the union, all relevant information used to determine Mr. Butler's suspension and revocation . . . (and that the carrier) have present at this hearing Mr. Steve Alleman (Transportation Manager AMTRAK) and Mr. Joseph Cook (Rules Examiner AMTRAK), so they say provide testimony."
>
> (7) It appears that at some time on March 24, 1992, Petitioner and Mr. Bruno met with a person identified as Mr. Gary Simmons, SEPTA's Superintendent, Southern District. In its response to FRA, SEPTA asserts that this meeting was intended to satisfy the hearing requirement of 49 CPR Part 240.307.
>
> (8) SEPTA has not provided any evidence which demonstrates that this meeting constituted an opportunity for a hearing before a presiding

3

officer other than the charging official; that the meeting was recorded; that Petitioner was ever given an opportunity to present evidence of any kind; or that Petitioner was given any opportunity to confront witnesses against him or review any evidence upon which SEPTA was intending to rely.

(9) SEPTA has not provided any evidence which demonstrates that a hearing was ever accorded petitioner; that a hearing was conducted by a presiding officer who was other than the charging official; or that a hearing record provides a basis for reaching its revocation decision.

Based on its review of the information provided, the Board finds that SEPTA did not comply with the procedures for suspending or revoking the Petitioner's certificate as provided for in 49 CFR Part 240.307 and that these procedural errors caused petitioner substantial harm.

There is no evidence that SEPTA provided Petitioner with proper notice of the reason for his suspension, the pending revocation, or an opportunity for a hearing as required by 49 CFR part. 240.307 (b) (2).  Moreover, SEPTA failed to comply with 49 CFR part 240.307 (b) (4) which requires that a decision to revoke certification must be based on the facts developed at the hearing and the hearing officer must explicitly state the basis for the conclusion reached.

Based on the above findings and conclusions, the Board hereby disapproves SEPTA's decision to revoke Petitioner's locomotive engineer certification in accordance with the provisions of Title 49 Part 240 of the Code of Federal Regulations.  The events concerning the operation of train 581 on March 14, 1992 shall be considered an incident for the purposes of §240.117 (e), §240.225, and §240.229. the Board's disapproval decision shall be shown on all SEPTA records, notations or references which specifically identify Petitioner, on all records which are kept in accordance with Part 240, and on any records which contain reference to SEPTA's revocation decision.

FRA Docket No. EQAL 92-38 (copy attached hereto as Exhibit No. 8).

To permit the deprivation of Engineer Daniels' "liberty" / "property" rights to continued employment without due process protection, would be to empower Respondent's agents to act under color of law in an arbitrary, capricious, invidious, discriminatory manner.  Such a holding by this Board would call into question of the constitutionality of 49 CFR §240.403 (c).

4

## REMEDY

Without waiver of his claim under the Railway Labor Act, Petitioner requests that this Board reverse the Carrier's decision to deny his certification or recertification and to expunge his personal record of any reference to or implication of the decertification. Petitioner further requests that any records maintained by FRA also be expunged of any reference to or implication of the decertification.

Respectfully Submitted,

Charles Rightnowar

Charles R. Rightnowar
Brotherhood of Locomotive Engineers
General Chairman
320 Brookes Drive
Suite 115
Hazelwood, MO 63042
Phone: (314) 895-5858
Fax:     (314) 895-0104

CRW/bad

5

**U. S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL RAILROAD ADMINISTRATION**
Washington, D.C. 20590

FEDERAL RAILROAD ADMIN

01 FEB 26  PM 3: 55

OFFICE OF CHIEF COUNSEL

January 31, 2001

Locomotive Engineer Review Board

Review and Determinations Concerning
Union Pacific Railroad Company's
Decision to Deny Mr. C. L. Daniels
Locomotive Engineer Certification

FRA Docket No. EQAL 00-51

---

### Decision

The Locomotive Engineer Review Board ("Board") of the Federal Railroad Administration ("FRA") has
reviewed the decision of the Union Pacific Railroad Company ("UP") to deny Mr. C. L. Daniels locomotive
engineer certification ("certification") in accordance with the provisions of Title 49 Part 240 of the Code of
Federal Regulations ("49 C.F.R. 240"). The Board hereby determines that UP's refusal to certify
Mr. Daniels was proper pursuant to 49 C.F.R. 240 for the reasons set forth below.

### Background

On February 3, 2000, Student Engineer Daniels ("Petitioner"), while operating Train ZMXYC 02 between
Bald Knob, Arkansas, and Dexter, Arkansas, failed a skills evaluation conducted by UP's Director of
Operating Practices, Mr. Larry Breeden. Immediately after the skills evaluation, Mr. Breeden verbally
notified Petitioner of the results. On February 7, 2000, Petitioner received a letter from Mr. Breeden
explaining the specific reasons for Petitioner's failure. On March 1, 2000, UP notified Petitioner that it
would not certify him as a railroad engineer because he had failed the requisite skills evaluation conducted
by Mr. Breeden.

A petition was filed with FRA on August 2, 2000, on behalf of Petitioner, requesting that FRA review
UP's decision to deny Petitioner's certification. The Petitioner asserts that UP's refusal to certify him was
improper because he was not afforded a hearing in which to present evidence of his qualifications as an
engineer. UP's failure to provide such a forum, according to Petitioner, constituted an impermissible denial
of his due process rights under the United States Constitution. Furthermore, the Petitioner claims that UP's
failure also contravened 49 C.F.R. 240.307, which requires a railroad, pending a decision to revoke an
engineer's certification, to convene a hearing for the purpose of providing the relevant parties with an
opportunity to present evidence and to cross examine witnesses. In support of his argument, Petitioner
cites Board decision EQAL 92-38, in which the Board reversed a railroad's decision to revoke a
certification because the railroad failed to convene a hearing pursuant to 49 C.F.R. 240.307.

Pursuant to 49 C.F.R. 240.405(b) and (c), a copy of the petition was sent to UP, and the railroad
was afforded an opportunity to comment. UP responded to FRA in a timely manner on October
2, 2000, and, as required by 49 C.F.R. 240.405(d)(2), provided Petitioner's representative with a
copy of the document that it submitted to FRA

**UP's Response**

UP asserts that 49 C.F.R. 240.219, which codifies the procedures for denying certification, applies in the instant case. UP notes that there is no requirement for a railroad to convene a hearing under this regulation. Rather, UP submits that it fully complied with the requirements of 49 C.F.R. 240.219 by notifying Petitioner of its refusal to certify him; by explaining the reason for its decision; and by providing Petitioner with a reasonable opportunity to explain or to rebut the adverse information upon which it ultimately based its decision. According to UP, Petitioner did not avail himself of this opportunity.

**Board's Determination**

Based on its review of the record, the Board has determined that:

(1)    In August 1998, Petitioner entered UP's six-month Student Engineer Training Program. He attended a three-week classroom training period and, thereafter, began on-the-job training.

(2)    On July 14, 1999, after an extended period, Petitioner completed the training program.

(3)    On September 8, 1999, Petitioner failed a skills evaluation in another territory and was placed back into a student status after UP officials determined that he needed additional training based his unsatisfactory performance.

(4)    On December 14, 1999, after three additional months of training, Petitioner failed another skills evaluation.

(5)    On February 3, 2000, Petitioner failed a third skills evaluation, this time conducted by Mr. Breeden, UP's Director of Operating Practices. Mr. Breeden immediately notified Petitioner of his failure.

(6)    On February 7, 2000, Mr. Breeden sent Petitioner a letter detailing the reasons why he had failed the third skills evaluation.

(7)    On March 1, 2000, UP sent Petitioner a letter explaining that it had decided to refuse to certify him as a locomotive engineer. The letter cited Petitioner's inability to qualify during the third skills evaluation as the basis for UP's refusal.

(8)    Despite having the opportunity to do so, Petitioner made no attempt to rebut or to explain the adverse information that formed the basis of UP's refusal to grant him certification.

**Analysis of the Petition**

The Board need not comment on the merits of Petitioner's constitutional argument. However, assuming *arguendo* that the 5th Amendment Due Process Clause is implicated in this case, the Board nevertheless

2

finds no procedural error sufficient to justify modifying UP's decision. Rather, the Board finds that UP complied fully with the applicable federal regulation and provided Petitioner with any rights granted therein

The Petitioner argues that UP failed to comply with the procedural provisions of 49 C.F.R. 240.307 because it did not give him a hearing. The Board finds no merit in this argument. The Board emphasizes that the instant case involves the *denial* of certification, rather than the revocation of certification. As such, Petitioner's rights in this case are properly governed by 49 C.F.R. 240.219, which does not require a railroad to convene a hearing. Instead, this regulation requires a railroad to notify a candidate for certification of any information that might form the basis for denying him certification and to provide the candidate with a reasonable opportunity to explain or to rebut that information in writing prior to a final determination of his case.

Accordingly, the record indicates that UP provided Petitioner with such an opportunity prior to its final decision. Mr. Breeden's letter with respect to Petitioner's third failed skills evaluation provided a detailed description of the information upon which UP would later base its decision to deny certification. Petitioner did not submit any information in his defense.

Regarding Petitioner's citation of a previous Board decision to bolster his argument in the instant case, the Board notes that its past decisions carry no precedential weight. Instead, the Board reviews each petition on a case-by-case basis. The decision reached in a particular case, therefore, is binding only with regard to the named parties.

Based on its review of the information provided, the Board finds that UP acted properly in refusing to certify Petitioner as a locomotive engineer. In doing so, the Board finds that UP complied fully with 49 C.F.R. 240.219. Based on these findings, the Board hereby approves UP's decision to deny Petitioner certification as a locomotive engineer in accordance with the provisions of 49 C.F.R. Part 240.

Issued this day in Washington, D.C. *January 27, 2001*.

*John F. Megary*
John F. Megary
Chairman
Locomotive Engineer Review Board

3



# Brotherhood of
# Locomotive Engineers

General Committee of Adjustment
Union Pacific Railroad Central Region

Government Exhibit 10

C.R. Rightnowar
GENERAL CHAIRMAN

R.E. Rhodes,
1ST VICE-CHAIRMAN

T.H. Wells
2ND VICE-CHAIRMAN

C.R. Brand
SECRETARY-TREASURER

320 Brookes Dr., Suite 115 • Hazelwood, MO 63042 • (314) 895-5858 • Fax (314) 895-0104



May 31, 2001

*FRA-2001-9837*

Ivornette L. Nelson
Docket Clerk
Federal Railroad Administration
1120 Vermont Avenue, N.W.
Mail Stop 10
Washington, D.C. 20590

01 JUN -4  AM 9: 54
OFFICE OF CHIEF COUNSEL
FEDERAL RAILROAD ADMIN

**RE: Engineer C. L. Daniels**
**Petition for Administrative Hearing**
**FRA Docket No. EQAL – 00 – 51**

Dear Ms. Nelson:

Pursuant to your telephone conversation this date with my secretary, Debbie Penning, I have enclosed a photocopy of the above-referenced Petition for Administrative Hearing, delivered to your office on February 16, 2001, to a R. Sgearrin ( I have enclosed a photocopy of the US Postal Service Track/Confirmation for your ready reference).

As this Petition was filed with your office within the time limits for same, I request that it be dated February 16, 2001, so that there be no argument as to the timeliness of the Petition.

Please advise.

Sincerely,

Charles Rightnowar

Charles R. Rightnowar

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL RAILROAD ADMINISTRATION**
**WASHINGTON, D.C.**

**FRA - LOCOMOTIVE ENGINEER CERTIFICATION CASE**
**ENGINEER C. L. DANIELS**
**FRA Docket No. EQAL-00-51**

**ENGINEER C. L. DANIELS PETITION**
**FOR ADMINISTRATIVE HEARING**

Pursuant to the provisions of 49 CFR Sec. 240.407, Engineer C. L. Daniels hereby requests an Administrative Hearing in the above-referenced proceeding.

Respondent:

Union Pacific Railroad Company
1416 Dodge Street
Omaha, Nebraska 68179

Respondent's Representative

Ms. Brigitte Hunsaker
Manager, Engineer Certification & Licensing
Union Pacific Railroad Company
SLCC-Science & Industry Building
Mail Stop – Union Pacific Railroad
4600 South Redwood Road
Salt Lake City, Utah 84123

This will acknowledge receipt of the decision by the Locomotive Engineer Review Board ("Board") in the above-referenced case, approving the Union Pacific Railroad's decision to deny Certification to Engineer C. L. Daniels, and to permanently discharge him.

The Board, in reaching this decision, never fully considered the merits of this case, and was in error in failing to do so.

First, the Board, incorrectly determined in paragraph (3) of its Determination at page 2 that the Petitioner "…was placed back into a student status…"; this information is wholly false. As noted at in Exhibit 3 to Petitioner's Petition for Review, page 1, second paragraph, Ms. Andrea Gansen, Assistant Director of Labor Relations, agreed with the

undersigned that Engineer Daniels "…was incorrectly paid as a student engineer (which the Carriers agrees to remedy)…." W. S. Hinckley, by letter dated March 17, 2000, stated, "I was in agreement that Mr. Daniels would be paid the engineer's rate for the trips in question…" (Copy Attached hereto as Exhibit 1). Ms. Brigitte Hunsaker's statement in her October 2, 2000, filing, falsely declared that Engineer Daniels "…was placed back into student status…" in the second paragraph of her Statement of Facts. Engineer Daniels was a fully qualified and certified Engineer on his original seniority district territory, and there is no evidence whatsoever that he has not continued to be qualified on his original seniority district territory. The undersigned made this position verbally known to the Carrier by telephone conversations, and face to face meetings. There is no method of testing the Carrier's determination as to Engineer Daniels' alleged lack of qualification on the *new* territory, added by the merger of the Union Pacific Railroad and the Southern Pacific Transportation Company, without an investigation, where the Carrier testing officer is confronted and cross-examined, with the right of Engineer Daniels to have notice and be heard, both personally and through witnesses, including his  Merger  Engineer, the Conductors, and other crew members, who could testify as to his day to day ability to perform his duties, developing evidence as to whether Engineer Daniels had received sufficient training, and developing evidence as to whether Engineer Daniels could work as an Engineer restricted to the territory where he was Certified, as had been done by Respondent for white Engineers.

Engineer Daniels had a reasonable expectation that such a hearing would be forthcoming because employees that have been disqualified or restricted to yard service on Respondent's predecessor rail Carriers, have long been provided the protection of notice and hearings. Award No. 2244, N.R.A.B. (1st Div. No Referee) (attached hereto as Exhibit 2), Award No. 3621, N.R.A.B. (1st Div. Swacker) (attached hereto as Exhibit 3), Award No. 12307, N.R.A.B. (1st Div. Boyd) (attached hereto as Exhibit 4). The so-called right to file a written response to the Respondent's agent who denied Certification does not comport with the due process rights guaranteed by the Amendments to the U.S. Constitution.

Second, if the regulations of the Federal Railroad Administration as to 49 CFR Sec. 240.219 deprive Engineer Daniels of his property right to continued Certification and employment without due process of law, then 49 CFR Sec. 240.219 is unconstitutional as violative of both the Fifth and Sixth Amendments to the U.S. Constitution. Private parties acting under the color of law must be required to observe Constitutional protections, otherwise the Union Pacific Railroad's employees/agents will be empowered to act under color of law in an arbitrary, capricious, invidious, discriminatory manner.

Third, the Board's refusal to follow the doctrine of *stare decisis* deprives Engineer C. L. Daniels equal protection of the law.

Based upon the above, C. L. Daniels request that an Administrative Hearing *de novo* be convened to determine the relevant facts and whether the denial of Engineer

Daniels' Locomotive Engineer Certification and permanent discharge by the Union Pacific Railroad was correct.

Respectfully submitted,

Charles R. Rightnowar
General Chairman
Brotherhood of Locomotive Engineers
320 Brooks Drive, Suite 115
Hazelwood, MO 63042
(314) 895-5858 FAX (314) 895-0104

Dated: February 14, 2001

*Foster*

Government Exhibit 11

ORDER NO. 5

## U.S. DEPARTMENT OF TRANSPORTATION
## FEDERAL RAILROAD ADMINISTRATION
## WASHINGTON, D.C.

FRA - LOCOMOTIVE ENGINEER CERTIFICATION CASE
**C.L. DANIELS,** Hearing Petitioner, DOT DKT.# FRA 2001-9837
(FRA Docket No. EQAL 00-51)

### DECISION AND ORDER OF DISMISSAL

### Introduction

I was assigned this case to hold the administrative proceeding requested pursuant to 49

C.F.R. § 240.407 on behalf of Charles L. Daniels (hereinafter "Hearing Petitioner" or "Daniels")

by his union representative at that time on the question of the propriety of a decision by Union

Pacific Railroad Company ("UP") denying his certification as a locomotive engineer.[1]

Previously, the Agency's Locomotive Engineer Review Board (the "Board") had made certain

findings and approved UP's decision.[2] On July 2, 2001, I issued an Initial Scheduling Order

("Order No.1") intended to move this case toward a narrowing of the actual disputes between the

parties over which I have jurisdiction in this limited proceeding.[3]

---

[1] The Hearing Request was filed by Mr. Charles R. Rightnowar, the Hearing Petitioner's General Chairman. Subsequently, International Vice President Richard K. Radek (also of the Brotherhood of Locomotive Engineers and Trainmen) entered an appearance for the Hearing Petitioner, and the case proceeded forward: Mr. Radek filed Hearing Petitioner Daniels' Statement of Issues ("HP's Statement of Issues"); he also initiated and concluded discovery, including conducting certain depositions. In August 2003, Mr. Daniels' present counsel appeared and succeeded his union representatives in the proceeding, after the close of discovery.

[2] Board Decision of January 29, 2001 at 3. - - I do not sit in review of the Board's Decision as this is a de novo proceeding. *See* Order No.1, Part II at 5; and Carpenter v. Mineta, 432 F.3d 1029, 1031 (9th Cir. 2005).

[3] *See* Order No.1, pages 5-7.

## Background and Prior Proceedings To Date

Order No. 1 identified the parties, set out the general background and circumstances of the case, and delineated the narrow scope of this de novo proceeding. Order No. 2, an "Order Denying [the Hearing Petitioner's] Motion For Remand, With Directions to The Parties" entered on November 18, 2003 also contained a discussion of this proceeding, noting: (A), that discovery (including the production of documents to the Hearing Petitioner) was closed by then;[4] and (B), that soon after the Hearing Petitioner retained his present counsel, he sought to have the case remanded to the Board, "predicated, at least in part, on [certain] documents apparently produced [by UP] in the discovery process[,]"[5] subsequent to the issuance of the Board's decision.[6]

The thrust of the remand motion was the contention that when the Board passed on Mr. Daniels' claims, it did not have the benefit of six documents relied on there, designated Exhibits A through F by the Hearing Petitioner in his Motion For Remand.[7] (Exhibits A-F were supposed to have been appended to the remand motion, but were not.) I denied the Hearing Petitioner's

---

[4]  See Joint Status Report filed by Co-Respondents on April 23, 2003.

[5]  See Order No. 2 at 2.

[6]  Unlike here where the regulations specifically provides for discovery, there is no discovery in proceedings before the Board; it decides its cases based on the record made at the carrier's "on-the-property" hearing. See 49.C. F.R.§ 240.409(d), and the discussion in Part IV of Order No.1 at 7. Though discovery was closed, I nonetheless stated in Order No. 2, that if counsel for the Hearing Petitioner "wishes to undertake further discovery . . . (such as a deposition of a carrier official who could elaborate under oath as to the meaning of the documents which . . . [he] now has in this possession"), he may file a motion by December 15, 2003 to do so.  Page 8, note 21.  No such motion was filed, however.

[7]  This case has been submitted to me for decision on the basis of a Joint Stipulation of Material Facts ("Stip. of Facts"); pursuant to Para. 24(h), these exhibits (A-F) are part of the stipulated record. - - Parenthetically, the successful efforts of counsel in reaching the replete stipulation of facts is much appreciated.

2

Motion For Remand in Order No. 2, concluding that "I have been given no authority to remand a case to the Board."[8] Further, I stated there that "because of my resolution of this motion as a matter of law (i. e., I lack authority to remand), these documents are irrelevant at this stage . . .".[9] However, I did direct the Hearing Petitioner to file and serve Exhibits A - F by December 1, 2003.[10]

Not long after the entry of Order No. 2 denying the remand motion with certain directions to the parties, Co-Respondent UP filed a motion to dismiss, which, for the most part, the Agency joined.[11] UP's motion to dismiss was predicated primarily on (A) the Hearing Petitioner's late filing of the aforementioned exhibits, and (B) his tardiness in other instances in this proceeding.[12] Significantly, though praying for ultimate relief, UP had not alleged in its motion to dismiss that it suffered any substantial harm by the ten-day delayed filing of these documents. The Agency shared UP's view on this point, but I found that "no particularized claim of harm is made here."[13] In short, I held in Order No. 3:

> [W]ith the entry of a new representative for the Hearing Petitioner

---

[8]  *See* Order No. 2 at 7.

[9]  Id. at 2.

[10]  Id. at 8.

[11]  FRA's Response to Petitioner's Response To . . . Motion To Dismiss ("FRA's Response") at 2. (UP's "Section 219 issue" raised there was not before me then, as correctly asserted in FRA's Response. Para. 4.)

[12]  It was conceded by the Hearing Petitioner's counsel that compliance with the direction in Order No. 2 (page 8) that he serve and file Exhibits A - F by December 1, 2003 was not timely, but the documents were served on December 11th, less than two weeks late.

[13]  *See* Order No. 3 at 4.

- - who apparently is also new to this somewhat non-traditional
administrative proceeding - - it would be too harsh under all of the
circumstances to avoid providing a forum wherein the parties can
address more fully whatever merits, if any, the Hearing Petitioner
might be able to demonstrate to entitle him to relief. [14]

I further noted that "I am guided overall by the marching orders of Section 409(b) with its

emphasis on a 'fair determination' of each case. To achieve this goal, I am authorized to take,

basically, any action to'aid in the disposition of the proceeding'." [15]

### A New Issue For Decision: "Newly Acquired Evidence"

Order No 4 (entered April 23, 2004) approved a stipulated briefing schedule: First, the

Hearing Petitioner, and then Co-Respondents UP and FRA each filed memoranda of law on the

merits of the case; the Hearing Petitioner did not file a rebuttal brief though specifically provided

for in that stipulated order.[16] However, subsequent to the filing of the parties' briefs (and the

close of briefing in accordance with Order No. 4), the Hearing Petitioner filed a letter "Request

To Submit Newly Acquired Evidence" dated August 25, 2005 ("August 25th Request") enclosing

a partial transcript of certain "testimony of Mr. D.W. Shepherd[,] Manager of Operating

Practices for Union Pacific."[17] The Hearing Petitioner requested "that this information be taken

into consideration and accepted as evidence in this case[,]" contending, inter alia, that this

---

[14] Id.

[15] Id. at 5.

[16] At 1, ¶ 3.

[17] August 25th Request at 1. - - It would have been highly preferable if the Hearing
Petitioner's counsel had filed a motion pursuant to Subsection 409(l) of Part 240 seeking relief
under Subsection 409(s) to reopen the record, rather than just sending in his "newly acquired
evidence" by letter submission; Subsection 409(l) provides for a response by any other party
opposing relief sought by way of motion.

4

relatively recent testimony (taken on August 3, 2005) "is of critical importance" to the proper disposition of this case.[18]

Both Co-Respondents oppose the admission into the record of the Hearing Petitioner's late proffer. UP basically contends that the new submission from the Hearing Petitioner should not be considered because the proffered "testimony refers to a scoring evaluation system in place in 2004-2005 and not the scoring evaluation system in place during the Petitioner's training in 1998-1999 and early 2000. As such it has no bearing on Petitioner's case."[19]

The Agency makes a similar opposing argument: "[T]he testimony relates to a UP grading system that was in place for an engineer evaluation that was completed in 2004 or 2005, not the UP grading system that was in place when Petitioner was in training . . . . *See Breeden Affidavit* . . . ".[20] (Emphasis original.) The Agency also argued - - and persuasively - - that the record in this case has long been closed, and the case briefed on the merits, citing 49 C.F.R. § 240.409(s).[21] It is hard to refute the Agency's correctly taken position.

Nonetheless, there is an escape clause of some undefined dimension in Subsection 409(s), namely that the record will be closed at the end of an evidentiary hearing "unless the presiding officer allows additional time for the submission of additional evidence." In reliance on that provision and the discretion afforded by Subsection 409(b) of Part 240 to regulate the conduct of

---

[18] Id.

[19] Carrier's Response To Petitioner's Request To Submit Newly Acquired Evidence ("Carrier's Response . . . Newly Required Evidence") at 1, Para. 1.

[20] Federal Railroad Administration's Response to Petitioner's Request To Submit Newly Acquired Evidence ("FRA's Response . . . Newly Acquired Evidence") at 3.

[21] FRA's Response . . . Newly Acquired Evidence at 1-2.

this proceeding to achieve "a fair determination of all material issues in controversy[,]"[22] I will

reopen the record and accept the Hearing Petitioner's submission in order to be able to reach a

conclusion on the merits of the Hearing Petitioner's claims on the basis of a full record.

However, as in all administrative proceedings, the admission of the Hearing Petitioner's

submission into the record is not an indication of what weight I will accord it. As Professor

Goldberg has written:

> [That] 'The rules of evidence do not apply in administrative
> proceedings,' is a phrase commonly used . . . . * * * While
> it is true that the rules of evidence, in so far as they govern
> questions of admissibility, are not applicable in
> administrative proceedings . . . [,] the rules of evidence are
> important in administrative proceedings to aid the
> Administrative Law Judge in determining the weight to be
> given evidence.[23] (Emphasis supplied.)

Accordingly, the Co-Respondents' arguments in opposition to the reopening of the record to

submit the Hearing Petitioner's "newly acquired evidence" will be considered in my weighing of

all of the parties' proffers.

## DISCUSSION

As a threshold matter, the nature of this proceeding and the appropriate standard

governing the disposition of the merits of the Hearing Petitioner's claims must be clearly defined.

These issues have been visited before in Section 409 proceedings. See Gomery, DOT DKT. #

FRA 2001-11249 Jan. 14, 2005) at 3-6.

---

[22] *And see* Order No. 3 at 5.

[23] Deskbook On Evidence For Administrative Law Judges at v (Nat'l. Jud. Coll. 1993).
(Subsection 409(n) of Part 240 merely references the Federal Rules of Evidence as "general
guidelines" for these proceedings.)

## The Nature Of This Proceeding

In Order No. 4, I specifically directed the parties to "address at the outset of their briefs the standard(s) to be applied in resolving the issues presented."[24]  All of the parties have recognized the de novo nature of this proceeding.[25]  (Again, the recent holding in Carpenter, supra, is to the same effect.[26])  Further, both Co-Respondents point out that the "preponderance of the evidence" standard of Subsection 409(q) of Part 240 is the level of burden which the Hearing Petitioner must carry in order to obtain the relief he seeks here.[27]

The Hearing Petitioner also noted that I have "the authority to decide the findings of fact and law."[28]  This statement is in accord with the conclusion I came to in Gomery, supra.  There, a threshold question was whether that proceeding was in the nature of "cross-motions for summary judgment (akin to Rule 56, Fed. R. Civ. P.), or as if a bench trial was had [in which findings of fact were rendered] (similar to a Rule 52 setting)."[29]  I relied, inter alia, in Gomery on Hess v. Hartford Life & Accident Insur. Co., 274 F.3d 456, 461 (7th Cir. 2001), where the Court stated:

---

[24]  Page 2.

[25]  C.L. Daniels Memorandum of Law ("Hearing Petitioner's Memo.") at 1; Union Pacific Railroad Company's Memorandum of Law and Response To Petitioner's Memorandum Of Law ("UP's Memo.) at 1; and The Federal Railroad Administration's Response To Petitioner C.L. Daniels' Memorandum Of Law ("FRA's Memo.") at 5.

[26]  432 F.3d at 1031.

[27]  UP's Memo. at 1; and FRA's Memo. at 5.

[28]  Hearing Petitioner's Memo. at 1.  (Emphasis supplied.)

[29]  At 3.

7

> The district court entered its judgment after receiving a stipulation
> of the facts that made up the administrative record . . . . * * * [W]e
> think that the procedure the parties followed here is more akin to a
> bench trial than to a summary judgment ruling.  See May v.
> Evansville-Vanderburgh Sch. Corp., 787 F.2d 1105, 1115-16 (7th
> Cir. 1986) (where parties agree to a judgment on stipulated facts,
> '[i]n effect the judge is asked to decide the case as if there had been
> a bench trial . . . .')  The standard of review that governs is
> therefore the one found in Fed. R. Civ. P. 52(a).

Accordingly, I held in Gomery "that the proper path here is to proceed in a 'bench trial on

the papers' fashion, and apply the 'preponderance of the evidence' standard as appropriate."[30]

Similarly, I shall do the same in this case.

### The Issues Presented For Decision

In a Joint Status Report submitted on April 7, 2004, the parties "narrowed the current

issues" presented for decision to the following:[31]

> a.  Whether Union Pacific Railroad Company erred in scoring
> Petitioner's evaluation rides by allocating the incorrect amount of
> points to Petitioner's score for code 'T' (train handling failures).
>
> b.  Whether Union Pacific Railroad Company properly denied
> Engineer Daniels' certification February 7, 2000, pursuant to 49
> CFR Part 240.219.

In their briefing, the parties, including the Hearing Petitioner, recognized that those were, in fact,

the issues to be decided here.[32]

---

[30]  At 6.

[31]  ¶ 1.

[32]  Hearing Petitioner's Memo. at 1; UP's Memo. at 1; and FRA's Memo. at 1.

8

### A Brief Synopsis Of The Relevant Facts

The facts relevant to resolving the stipulated issues presented for decision are of Doric simplicity in this case. - - In barest outline, Hearing Petitioner Daniels, then a brakeman or switchman, entered UP's student engineer certification program in 1998. Stip. of Facts, ¶ 2. He achieved "an acceptable score" in the classroom segment of the engineer certification training program. Id. ¶ 3. The Hearing Petitioner also completed innumerable trips as a student engineer and a train service engineer. Id. ¶'s 5 & 8.

However, "[o]n February 3, 2000, Mr. J. L. Breeden [then a UP Regional Director of Train Operating Practices Compliance] . . . accompanied petitioner on a skills performance ride, and gave Petitioner what UP deemed to be a failing score of sixty-one (61)." Id. ¶ 18. In a February 7, 2000, letter, "Mr. Breeden notified Petitioner of the specific reasons that Petitioner failed the February 3, 2000, skills performance test[,]" and therefore removed him from service because of his failure on the skills test. Id. ¶ 19. In his February 7th letter,[33] Breeden set forth with specificity the reasons why the Hearing Petitioner was denied certification by UP:

> You did not successfully pass the skills performance test
> conducted on February 3, 2000 . . . .[[34]] I must ensure [that] all
> locomotive engineers are rules and skills competent. The ride
> evaluation included the following exceptions. You operated the
> train at 20 miles per hour over a 10 mile per hour speed restriction
> in the siding at Bald Knob. You moved the throttle lever two and
> sometimes three notches at a time at White River, South Newport
> and North Newport. The time required moving from power to
> dynamic braking is 20 seconds and you waited only 6 seconds at
> several locations including the locations above and Poplar Bluff
> and Dexter. The engineer and I had to remind you three times of

---

[33] Attachment 24(d), Stip. of Facts (also Exhibit 5 to the Breeden deposition transcript).

[34] Emphasis supplied.

9

the rule requirement while moving at restricted speed.  You did
stop before passing the red flag near Newport but only after I
instructed you that you must be prepared to stop in one half the
range of vision.  You also failed to acknowledge the red flag with
the required whistle signal.  The slack in the train was not
controlled at the stop signal at South Newport, North Newport or
Diaz Jct.  You also applied 70 pounds of independent brake to stop
at South Newport.  You stacked the air at multiple locations
including the stop at Daiz Jct. and the permanent speed restriction
at Walnut Ridge.  You also failed to control the slack at Neelyville
and Dexter.  You did not know the territory at Alicia, Delaplaine,
or Peach Orchard.  The train was controlling your actions at all
Stop signals and while operating at restricted speed, you also did
not understand train - track dynamics as it relates to train forces.  In
general you did not control th[e] train in accordance within the
rules and train handling practices. * * *

       We have the obligation to require all locomotive engineers
[to] be proficient in rules knowledge and application of those rules
as well as skills performance.

"Petitioner did not rebut or attempt to explain, in writing, the adverse information detailed in Mr.

Breeden's letter of February 7, 2000."  Id.¶ 20; Daniels Deposition, Tr. At 25.  Hence,  UP

Superintendent Jerry Everett in a letter of March 1, 2000, "terminated Petitioner's employment

. . . per a collective bargaining agreement and stated that '[p]ursuant to Mr. Larry Breeden's letter

of February 7, 2000, your certification as a locomotive engineer was denied due to your inability

to qualify as an engineer'."  Id. at 22.

### The "Scoring Issue"

       This issue is the crux of this entire case.  If the Hearing Petitioner does not carry his

burden of proving by a preponderance of the evidence that Breeden improperly scored his

February 3rd evaluation ride or skills performance test, it is axiomatic that he cannot prevail on

the second issue ((b) above) presented for decision by stipulation of the parties.

10

1. The Legal Setting Of UP's Certification Program In Place In February 2000

The Ninth Circuit in Carpenter, supra, approved the Agency's approach to fulfilling its

delegated responsibilities under the Federal Railroad Safety Act of 1970 ("FRSA"), Pub. L. No.

91-458, as amended, 49 U.S.C. § 20101 et seq. There, the Court noted:[35]

> With the purpose of ensuring railway safety, these regulations [in
> 49 C.F.R. Part 240] require individual railroads to adopt training
> and certification programs that meet the minimum requirements of
> Part 240. * * * With respect to new engineer candidates, the
> regulations require a course of training as well as success on both
> knowledge and skills tests before a railroad may issue a
> certification. * * * The FRA does not actively participate in
> engineer testing or certification . . . . (Emphasis supplied.)
>
>                 * * *
>
> The FRSA and the FRA's implementing regulations were enacted
> to improve railway safety, in part by ensuring that locomotives are
> only operated by qualified and safe engineers.

The Court of Appeals noted with approval FRA's "arms-length regulation" of the

locomotive engineer certification process conducted by carriers,[36] observing that under the

regulations "'a railroad [has] latitude in selecting the design of its own testing and evaluation

procedures'."[37] Thus, the he Court concluded: "The regulations confirm that training and

certification is at the discretion of the railroads, subject to initial approval [by FRA] of their

programs]."[38] - - This is the regulatory setting in which UP conducted its engineer certification

program in February 2000 when the Hearing Petitioner was administered his pivotal skills test.

---

[35]  432 F.3d at 1031.

[36]  Id. at 1035.

[37]  Id.

[38]  Id. at 1034.

11

2. UP's Skills Testing Program In February 2000

To implement its statutory responsibilities to establish a procedure for the qualification of

locomotive engineers, the Agency, _inter alia_, promulgated Appendix E To Part 240 (in 49 C.F.

R.), entitled, "Recommended Procedures For Conducting Skill Performance Tests" which

provides, in part:

> FRA requires . . . that locomotive engineers be given a skill
> performance test prior to certification . . . Railroads are given
> discretion concerning the manner in which to administer the
> required testing. FRA has afforded railroads this discretion to
> allow individual railroad companies latitude to tailor their testing
> procedures to specific operational realities.

> \* \* \*

> Compliance [by a certification candidate] with the railroad's
> operating rules, including its safety directives and train handling
> rules, and compliance with Federal regulations should be carefully
> monitored.

Appendix E also requires a railroad "to have a definite standard so that the engineer and any

reviewing body can know what the certification candidate is being measured against." It

mandates that "railroads conduct the test in the most objective manner possible . . ."[,] providing

further:

> One way to reduce the entry of subjective matters into the
> qualification procedures is through the use of a document that
> specifies those criteria that the designated supervisor of locomotive
> engineers is to place emphasis on.

As previously pointed out, the parties have agreed that following his February 3rd skills

evaluation ride, the Hearing Petitioner was given "what UP deemed to be a failing score of sixty-

one (61)."[39] They also stipulated to the methodology employed by UP in evaluating skills tests at the time that the Hearing Petitioner was evaluated in February, 2000:

> UP's system for grading a train service engineer or a student engineer for performance evaluations, certificate evaluations . . . . is a point system. There are several different evaluation categories, each assigned a maximum point value. * * * When all points in each category are added together the total maximum point value a train service engineer or a student engineer can receive on any evaluation is [a]100 points. Stip. of Facts, ¶ 23.

The Hearing Petitioner's "Organization Exhibit C" (entitled "TRAIN RIDES (100 max- - RULES COMPLIANCE"), designated as part of Paragraph 24(h) of the parties' Stipulation of Facts, sets forth the amount of points given by UP in 2000 for various fields of the evaluation criteria; they total a 100 points. (This document is identical to Breeden Deposition Exhibit 9.) Further, it is undisputed that "[a] passing score is 80."[40]

To reemphasize, the critical issue for decision in this case is simply whether UP "erred in scoring Petitioner's evaluation rides by allocating the incorrect amount of points to Petitioner's score for code 'T' (train handling failures)."[41] And again, Mr. Daniels was deemed unqualified by UP for certification as an locomotive engineer, and subsequently discharged, based upon the results of his "skills performance test conducted on February 3, 2000 . . .".[42] That is the pivotal "test ride" in the disposition of this case, and I hold that based on the stipulated record, this Hearing Petitioner has not carried his burden of demonstrating by a preponderance of the

---

[39] Stip. of Facts, ¶ 18.

[40] Hearing Petitioner's Memo. at 6; Breeden Dep. Tr. at 27.

[41] April 7th Joint Status Report, ¶ 1(a),

[42] Breeden letter of Feb. 7, 2000, Attachment 24, Stip. Of Facts. (Emphasis supplied.)

13

evidence that earlier test rides have relevance as to whether UP properly denied him certification on February 7, 2000, the second of the stipulated issues. (He had failed two earlier skills evaluation test rides on September 8, 1999 and December 14, 1999.[41])

The **undisputed** fact of the matter is that Mr. Breeden, who gave Mr. Daniels his February 3rd test ride, was involved with the development of UP's Ride Evaluation Criteria which had been in place since 1992.[44] I find that based on his uncontroverted affidavit, he had personal, direct, first-hand knowledge of UP's skills evaluation scoring system extant at the time that he gave Mr. Daniels his February 3rd test ride, as well as the mechanics of how the UP scoring process worked. The Hearing Petitioner has offered no credible evidence that refutes the assertions in the Breeden affidavit, much less has he carried his burden of doing so by a preponderance of the evidence. Accordingly, I afford the Breeden affidavit great weight in making my determinations in this proceeding.

In 1995, the UP scoring process was automated in that software was developed "that would automatically tabulate the numerical score when the letter scores were entered into the computer system."[45] Under this system, a "T" grade (train handling failure) from a ride evaluator equated to "0" points, or a failure for that element of the evaluation.[46] Under this system, the ride evaluator such as Mr. Breeden had no leeway whatsoever to adjust the value attributed to a "T," or any other letter grade given to a certification candidate.

---

[43]  Board Decision at 2.

[44]  Breeden Affidavit, ¶ 2

[45]  Id., ¶ 3.

[46]  Id.

14

During the February 3rd test ride, Mr. Breeden gave Mr. Daniels two "T" letter grades "for failures with 'Independent Brakes' and 'Controls Slack.'"[47] After he entered the "T" letter grades into UP's computer system, Mr. Daniels automatically received "0" points for those two ride elements, and the zero points became part of his numerical score for his skills evaluation.[48]

While 80 percent was a passing grade in the skills evaluation test, Mr. Daniels' points computed by UP's software only equaled 61 points, by far a failing score.[49] Indeed, the Agency correctly point out that even if Mr. Daniels was assigned 50 percent of the numerical values for these two elements as he contends should have been the case - - or two and a half points for each, for an extra five points - - his score would have only be 66, still a failing grade.[50]

The Hearing Petitioner submitted an Affidavit of Charles R. Rightnowar ("Rightnowar Affidavit), his brotherhood's General Chairman. Mr. Rightnowar asserted in his affidavit that "A . . . "T" [in the UP skills evaluation system] indicates that the engineer requires additional training or coaching for the particular skill needed for that particular category, and half the maximum points are awarded for that skill."[51] However, Mr. Rightnowar candidly admitted that "The information in this affidavit is based on speaking . . . to numerous experienced engineers in the railroad industry."[52] Unlike Mr. Breeden, Mr. Rightnowar asserted no personal knowledge of

---

[47] Id., ¶ 6.

[48] Id.

[49] See note 40, supra, and page 4 of Exh. 8 to Breeden Dep. Tr.

[50] FRA's Memo. at 9.

[51] § 8.

[52] § 3. (Emphasis supplied.)

15

the UP skills evaluation criteria in place in February 2000, but to the contrary fully admits that the assertion in Paragraph 8 of his affidavit is based on pure hearsay, and only hearsay. While hearsay has a place in administrative proceedings,[53] here Mr. Rightnowar's hearsay assertion is clearly trumped by Mr. Breeden's assertions's based on his direct, personal knowledge. Hence, I give no weight to the Rightnowar Affidavit, and clearly the Hearing Petitioner has not satisfied his burden of demonstrating by a preponderance of the evidence that he passed his February 3rd skills test based on the evidence submitted up to the time of the briefing of this case.

This brings us to the post-briefing "newly acquired evidence" originating in 2005. Earlier, in admitting the Hearing Petitioner's submission into the record, I stated that I would consider UP's and the Agency's argument's in opposition in determining what weight I should ascribe to this submission. In reviewing the 2005 submission from the Hearing Petitioner, viz., a partial transcript of testimony of D.W. Shepherd (the "Shepherd Transcript"), a UP Manager of Operating Practices, at an "on-the-property" hearing of another UP employee, I see little relevance to the February 2000 scoring issue which is the crux of this Daniels case.

First, the issue raised by this Hearing Petitioner as to the proper scoring of his February 3rd tests ride focused on whether UP credited the proper number of points for the "T" letter grades which he received, as emphasized by the Rightnowar Affidavit. However, there was no mention by the Hearing Petitioner of any "C" grade, nor evidence that he received such a grade on any element of his test ride. On the other hand, the focus of the partial Shepard Transcript

---

[53] Goldberg, supra, at IV-7.

16

submitted as "newly acquired evidence" focused on a "C" grade.[54] (See pages 100 to 104 of the Shepard Transcript.) Secondly, there is absolutely no mention in the Shepherd Transcript of a "T" grade, the scoring issue raised by the Hearing Petitioner in this case.[55]

Additionally, there is nothing in this record to establish that UP's scoring methodology employed in August 2005 was identical to its scoring process in February 2000. Further, UP's assertion that it "has revised various parts of its 49 CFR 240 programs[]"[56] and that "[t]he [Shepherd] testimony refers to a scoring evaluation system in place in 2004-2005 and not the scoring evaluation system in place during Petitioner's training in . . . early 2000[]"[57] was not refuted by the Hearing Petitioner. Accordingly, I give no weight to the Hearing Petitioner's "newly acquired evidence" as it simply has not been demonstrably connected with or tied into the two limited issues which the parties stipulated needed to be decided in this case.

In sum, this Hearing Petitioner's case must be dismissed because of a failure of proof. He simply has not carried his burden of demonstrating that UP improperly scored the February 3rd test ride on which UP's February 7th withholding of his certification as a locomotive engineer was based. Finally, as I intimated earlier, if he failed his February 3rd test ride - - and he has not

---

[54] There is also some discussion in the Shepherd Transcript at the of UP's Employee Development Review which includes such items as whether the employee had received on the job personal injuries (at 96-97) which is far afield from anything at issue in Mr. Daniels' certification case.

[55] April 7th Joint Status Report, ¶ 1. - - But again, even if Mr. Daniels had been given one-half of the point values for his two "T" grades for his train handling failures, he still would be far from reaching a passing score of 80 percent!

[56] Carrier's Response . . . Newly Acquired Evidence, ¶ 5at 2.

[57] Id. ¶ 1 at 1.

17

established by a preponderance of the evidence that it was improperly scored - - then UP did properly deny him certification as a locomotive engineer on February 7th, 2000. Indeed, that denial was mandated in the interest of rail safety: The February 7th Breeden letter satisfied Section 219(a), and the parties stipulated that he did not respond to this detailed notification of his deficiencies; UP waited before sending him the March 1st letter so he had plenty of time in which to object or otherwise respond the assertions in the February 7th Breeden letter. Parenthetically, this Section 219 issue appears to be an afterthought interjected for purposes of litigation.

### Conclusion

For the foregoing reasons, Hearing Petitioner Daniels' Hearing Request is dismissed with prejudice. - - Akin to the practice authorized by Rule 52(a) of the Federal Rule of Civil Procedure, the foregoing memorandum order is deemed to satisfy the requirements of 49 C.F.R. § 240.409(t) and (u).


It is so ORDERED, this 14th day of April, 2006.


G. Joseph King
Administrative Hearing Officer

18

SERVICE LIST EQAL 00-51 (Daniels-UP)

Mr. Larry Brennan
Mgr., Engineer Certification and Licensing
Union Pacific Railroad Company
SKCC - Science & Industry Bldg.
4600 S. Redwood Rd. -- Mail Stop UPRR
Salt Lake City, UT 84123

Mr. C. L. Daniels
1404 Country Club Road
Sherwood, AR 72120

Thomas H. Geoghegan, Esquire
Deborah L. Mahoney, Esquire
Carol Nguyen, Esquire
Despres Schwartz & Geeoghegan
77 W. Washington Stt. - Suite 711
Chicago, IL. 60602-2803

W. Scott Hinckley, Esquire
Union Pacific Railroad Company
1400 Douglas Stop 1180
Omaha, NE 68179

Mr. Richard K. Radek
V. P., BLET Arbitration Dept.
500 Standard Bldg.
1370 Ontario Street
Cleveland, Ohio 44113-1702

Mr. C. R. Rightnowar
General Chairman, BLET
320 Brookes Drive, Suite # 115
Hazelwood, MO 63042

Melissa L. Porter, Esquire
FRA, USDOT, RCC -12
1120 Vermont Avenue, N.W. - - Mail Stop 10
Washington, D.C. 20590

DOT Docket Clerk, Central Docket
  Management System - - SVC 124.10
USDOT, Room PL 401 Nassif
400 7th Street, S.W.
Washington, D.C. 20590

Government Exhibit 12

3991005

FRA 2001-9831-45

## U.S. DEPARTMENT OF TRANSPORTATION
## FEDERAL RAILROAD ADMINISTRATION
## WASHINGTON, D.C.

### APPEAL OF PETITIONER C.L. DANIELS

The Brotherhood of Locomotive Engineers, Central Region, on behalf of Petitioner C.L.

Daniels, hereby appeals ORDER No. 5 - U.S. Department of Transportation - Federal Railroad

Administration, FRA - Locomotive Engineer Certification Case - C.L. Daniels, Petitioner,

Docket No # EQAL 00-51 (FRA 2001-9837) and the Honorable Judge G. Joseph's Kings'

decision pursuant to 49 C.F.R. § 240.211(a).

### Basis of Appeal

Charles Daniels appeals the failure of the presiding officer to render a decision as to

whether in September 1999 Union Pacific could demote him to a student engineer with a student

or Class III certificate and revoke his full license or Class I certificate without the hearing

required by 49 C.F.R. § 240.307 as to whether Union Pacific had grounds under 49 C.F.R. §

240.117 to proceed with such a revocation so as to return him to student status. Although Union

Pacific and the FRA counsel argue the merits of this question in the brief below, the presiding

officer makes no reference at all to it. Since there is no order by the presiding officer addressing

the issue, Daniels has been prejudiced in this appeal and in the exercise of his right to seek

review. Furthermore, the failure even to address or make any reference to the issue or to require

adherence to any kind of due process in the revocation of his Class I certificate is evidence of

impermissible bias against Charles Daniels and in favor of Union Pacific in the administrative

process.

Charles Daniels requests that the administrative consideration of his case has been

irreparably tainted with error and that rather than a remand of his case for resolution of the issue,

the FRA is under an immediate legal and constitutional duty to restore his Class I certificate and

reinstate him as an engineer with full back pay.

Respectfully submitted

*Thomas H. Geoghegan*  *per C.N.*
One of the attorneys for Petitioner

Thomas H. Geoghegan
Carol Nguyen
Despres Schwartz & Geoghegan
77 W. Washington St., Suite 711
Chicago, IL 60602

cc:    Mr. C.L. Daniels
       Mr. Rightnowar
       Mr. Larry Brennan
       Mr. W. Scott Hinkley
       Ms. Melissa L. Porter
       DOT Docket Clerk, Central Docket

2

**U.S. DEPARTMENT OF TRANSPORTATION**
**FEDERAL RAILROAD ADMINISTRATION**
**WASHINGTON, D.C.**

---

**NOTICE OF FILING**

To:    See Service List

PLEASE TAKE NOTICE that on March 19, 2006 I sent via overnight mail the **APPEAL OF PETITIONER C.L. DANIELS** to the U.S. DEPARTMENT OF TRANSPORTATION FEDERAL RAILROAD ADMINISTRATION WASHINGTON, D.C., at 400 Seventh Street SW., Washington, DC 20590.

Dated: March 19, 2006

_____
One of the Attorneys for Plaintiffs

Thomas H. Geoghegan
Jorge Sanchez
Carol Nguyen
Despres Schwartz & Geoghegan
77 W. Washington, Suite 711
Chicago, IL 60602

**CERTIFICATE OF SERVICE**

I, Carol Nguyen, an attorney, have caused to be served a copy of this notice, and Appeal of Petitioner C.L. Daniels to those named on the service list by mailing these documents on May 19, 2006.

_____
Carol Nguyen

<u>SERVICE LIST EOAL 00-51</u> (Daniels-UP)

Mr. Larry Brennan
Mgr., Engineer Certification and Licensing
Union Pacific Railroad Company
SKCC - Science & Industry Bldg.
4600 S. Redwood Rd. — Mail Stop UPRR
Salt Lake City, UT 84123

Mr. C. L. Daniels
1404 Country Club Road
Sherwood, AR 72120

Thomas H. Geoghegan, Esquire
Deborah L. Mahoney, Esquire
Carol Nguyen, Esquire
Despres Schwartz & Geeoghegan
77 W. Washington Stt. - Suite 711
Chicago, IL. 60602-2803

W. Scott Hinckley, Esquire
Union Pacific Railroad Company
1400 Douglas Stop 1180
Omaha, NE 68179

Mr. Richard K. Radek
V. P., BLET Arbitration Dept.
500 Standard Bldg.
1370 Ontario Street
Cleveland, Ohio 44113-1702

Mr. C. R. Rightnowar
General Chairman, BLET
320 Brookes Drive, Suite # 115
Hazelwood, MO 63042

Melissa L. Porter, Esquire
FRA, USDOT, RCC -12
1120 Vermont Avenue, N.W. - - Mail Stop 10
Washington, D.C. 20590

DOT Docket Clerk, Central Docket
 Management System - - SVC 124.10
USDOT, Room PL 401 Nassif
400 7th Street, S.W.
Washington, D.C. 20590

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL RAILROAD ADMINISTRATION
WASHINGTON, D.C.

Appeal of C. L. Daniels

(FRA—Locomotive Engineer Certification Case)

Docket No. EQAL 2000–51

DOT Docket No. FRA 2001-9837

## THE ADMINISTRATOR'S FINAL DECISION

### INTRODUCTION

Petitioner, C. L. Daniels ("Daniels"), represented by Thomas H. Geoghegan and Carol

Nguyen, Despres Schwartz & Geoghegan, appealed to the Administrator of the Federal Railroad

Administration ("FRA"), under the provisions of 49 CFR § 240.411, from a decision of an

Administrative Hearing Officer ("AHO") dismissing Daniels' hearing request with prejudice.

A response was filed by FRA.

### STANDARD FOR REVIEW

The regulation governing appeals from decisions of presiding officers (in this case an

AHO) (49 CFR § 240.411) does not enunciate the standard for review; however, administrative

practice suggests that the scope of review is limited to determining if the AHO's findings of fact

are supported by substantial evidence. In other words, a review must be made to determine

whether the AHO relied upon such evidence in the record of the hearing as a reasonable mind

might accept as adequate to support the factual findings made.[1] But in making this review, the

---

[1] Edgar v. Shalala, 859 F.Supp. 521, 524 (D. Kansas 1994).

Administrator's discretion is not to be substituted for that of the AHO in evaluating the evidence.[2] And the possibility of drawing two inconsistent factual conclusions from the evidence does not necessarily indicate that the AHO's findings are not supported by substantial evidence.[3]

Issues of law are to be considered de novo, requiring an independent determination of the matter at stake.[4]

### SYNOPSIS OF THE FACTS

The essential facts relevant to this appeal are not in dispute. On February 7, 2000, Daniels was notified, in writing, that he was being removed from service because of failing a certification evaluation, namely a certification ride conducted on February 3, 2000, by Mr. J. L. Breeden (then the Regional Director of Train Operating Practices Compliance for the Southern Region of the Union Pacific Railroad Company ("UP")), in which Daniels scored a failing score of 61. Daniels did not rebut or explain, in writing, the adverse information detailed in Mr. Breeden's letter of February 7, 2000. On March 1, 2000, UP Superintendent, Jerry Everett, terminated Daniels' employment with UP per a collective bargaining agreement and stated that "[p]ursuant to Mr. Larry Breeden's letter of February 7, 2000, your certification as a locomotive engineer was denied due to your inability to qualify as an engineer."

Daniels petitioned the Locomotive Engineer Review Board ("LERB") to review the February 7, 2000, decision denying him certification as a locomotive engineer. The LERB

---

[2] Talbot v. Heckler, 814 F.2d 1456, 1461 (10th Cir. 1987).

[3] Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026 (1966); Gouveia v. Immigration and Naturalization Service, 980 F.2d 814, 818 (1st Cir. 1992).

[4] Janka v. Department of Transportation, National Transportation Safety Board, 925 F.2d 1147, 1149 (9th Cir. 1991).

3

denied his petition on January 29, 2001.

Daniels requested a de novo hearing before the AHO.  In a decision dated April 19, 2006, the AHO dismissed the hearing request with prejudice, finding failure of proof.

LEGAL ISSUES TO BE DECIDED

The initial legal issue is whether Daniels' appeal was timely filed.

The second issue on appeal is whether Daniels has enunciated any error of law which might form the basis for reversal or modification of the decision of the AHO.

The final issue on appeal is whether the remedies requested by Daniels are permissible pursuant to the regulations governing this process.

DISCUSSION

Timeliness of the Appeal

Appeals to the Administrator must be filed within 35 days after the issuance of the decision being appealed.[5]  The AHO issued his decision on April 19, 2006.  Daniels' appeal was dated March 19, 2006,[6] and was marked received by the FRA's Executive Secretariat on May 24, 2006.  It is clear that the Daniels has met the filing deadline, since the later date involved–the correct date–is within the period provided by regulation for appeal.  The appeal was timely filed.

Error of Law

Daniels' basis for appeal is--

> "the failure of the presiding officer to render a decision as to whether in September 1999 Union Pacific could demote him to a student engineer with a

------

[5] 49 CFR § 240.411(a).

[6] It is clear that the March 19, 2006, date is a typographical error, since the certificate of service states that the pleading was served on May 19, 2006, and the appeal could not have predated the matter being appealed.

4

> student or Class III certificate and revoke his full license or Class I certificate
> without the hearing required by 49 C.F.R. § 240.307 as to whether Union Pacific
> had grounds under 49 C.F.R. § 240.117 to proceed with such a revocation so as to
> return him to student status."[7]

Daniels complains that since there is no order by the presiding officer addressing the issue, he

has been prejudiced in his appeal. Daniels also cites bias against him, and claims that the case

has been irreparably tainted with error.

In a joint status report submitted to the AHO on April 7, 2004, the parties narrowed the

issues for decision to the following:

> "a. Whether Union Pacific Railroad Company erred in scoring Petitioner's
> evaluation rides by allocating the incorrect amount of points to Petitioner's score
> for code 'T' (train handling failures).

> "b. Whether Union Pacific Railroad Company properly denied Engineer Daniels'
> certification February 7, 2000, pursuant to 49 CFR 240.219."[8]

The decision of the AHO is based upon an examination of the issues the parties agreed in

the joint status report should be adjudicated. But Daniels' appeal is based upon complaints with

respect to issues which were not before the AHO. Nor were those issues ever before the LERB.

Daniels may not make arguments on appeal with respect to issues which were never considered

by the AHO by agreement of the parties themselves. As has been previously enunciated in

Appeal of Thomas T. Wells, Jr.,[9] objections not presented to an administrative agency may not be

made for the first time to a reviewing court, or by analogy, on appeal to the Administrator.[10] If

---

[7] Daniels' Appeal, at 1.

[8] AHO Decision, at 8.

[9] Docket No. 99-96 (DOT Docket # FRA 2000-7596), April 17, 2001, at 2.

[10] United States v. L.A. Trucker Truck Lines, 344 U.S. 33, 37, 73 S. Ct. 67, 69, 97 L.Ed. 54 (1952).

5

Daniels had concerns with respect to other legal issues involved in this proceeding, those issues should have been included in the joint status report as requiring adjudication by the AHO, and should have been brought before the LERB. Having not included such issues for determination below, any objection on appeal with respect to them is waived.

Daniels alleges bias against him and claims that the case has been irreparably tainted with error. But beyond making those claims, Daniels offers no facts or legal authority in support of the allegations. A claim of bias must be supported by evidence of its extra-judicial source, such as personal prejudice concerning a party, or personal knowledge of disputed evidentiary facts.[11] And a claim of error should include citation to some legal principle upon which the claim is based. Daniels has offered nothing in the appeal to meet this burden of proof.

I find no error of law in the decision of the AHO and no evidence of bias.

Remedies

Daniels claims that FRA is under an immediate duty to restore his Class I certificate and reinstate him as an engineer with full back pay.[12]

The regulation governing appeals provides only that the Administrator may "remand, vacate, affirm, reverse, alter or modify the decision of the presiding officer,"[13] here the AHO. No other remedies are provided.

As has been enunciated in Appeal of Robert E. Carpenter,[14] if there is no statute

---

[11] See the standards set forth in Liteky v. United States, 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

[12] Daniels' Appeal, at 2.

[13] 49 CFR § 240.411(e).

[14] Docket No. EQAL 97-48, February 19, 2004, at 6-7.

6

conferring authority on an administrative agency, it has none.[15]  This necessarily includes those actions of the Administrator on appeal from a decision of the AHO.  An agency literally has no power to act unless and until Congress confers power upon it.[16]  It follows, since regulations may only be promulgated in accordance with powers granted by Congress, that the power to act under regulation is limited to the powers therein granted.  Nor can the parties themselves confer subject-matter jurisdiction on a tribunal, in this instance the deliberations of the Administrator.[17]

The remedies Daniels seeks are simply beyond the legal authority of the Administrator to provide.  Even assuming that I found a foundation for these remedies, which I do not, I have no lawfully constituted power to order a railroad to restore Daniels' certificate, to reinstate him, or to provide for back pay.

### CONCLUSION

For the reasons stated above, Daniels' appeal is denied.  My decision constitutes the final action of the FRA in this matter, pursuant to 49 CFR § 240.411(e).

Dated:  ___7/31/2006___

Joseph H. Boardman
Administrator

---

[15] Michigan v. E.P.A., 268 F.3d 1075, 1081 (D.C. Cir. 2001).

[16] Railway Labor Executives' Ass'n. v. National Mediation Board, 29 F.3d 655, 670 (D.C. Cir. 1994).

[17] Dunklebarger v. Merit Systems Protection Board, 130 F.3d 1476, 1480 (Fed. Cir. 1997).

SERVICE LIST EQAL 00-51
DOT Docket No. FRA 2001-9837

Mr. Larry Brennan
Mgr., Engineer Certification and Licensing
Union Pacific Railroad Company
SKCC - Science & Industry Bldg.
4600 S. Redwood Rd. -- Mail Stop UPRR
Salt Lake City, UT 84123

Mr. C. L. Daniels
1404 Country Club Road
Sherwood, AR 72120

Thomas H. Geoghegan, Esquire
Deborah L. Mahoney, Esquire
Carol Nguyen, Esquire
Despres Schwartz & Geeoghegan
77 W. Washington Stt. - Suite 711
Chicago, IL. 60602-2803

W. Scott Hinckley, Esquire
Union Pacific Railroad Company
1400 Douglas Stop 1180
Omaha, NE 68179

Mr. Richard K. Radek
V. P., BLET Arbitration Dept.
500 Standard Bldg.
1370 Ontario Street
Cleveland, Ohio 44113-1702

Mr. C. R. Rightnowar
General Chairman, BLET
320 Brookes Drive, Suite # 115
Hazelwood, MO 63042

Melissa L. Porter, Esquire
FRA, USDOT, RCC -12
1120 Vermont Avenue, N.W. - - Mail Stop 10
Washington, D.C. 20590

DOT Docket Clerk, Central Docket
  Management System - - SVC 124.10
USDOT, Room PL 401 Nassif
400 7th Street, S.W.
Washington, D.C. 20590